621 A.2d 63

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. RAFAEL VALENZUELA, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 13, 1993—Decided February 25, 1993.

Before Judges KING, BRODY and LANDAU.

*Zulima V. Farber,* Public Defender, attorney for appellant (*Cynthia N. McKee,* Designated Counsel, of counsel and on the brief).

*Robert J. Del Tufo,* Attorney General, attorney for respondent (*Steven V. McGettigan,* Deputy Attorney General, of counsel and on the letter brief).

The opinion of the court was delivered by

BRODY, J.A.D.

Defendant was sentenced to prison for ten years after a jury found him guilty of second-degree sexual assault. The verdict was returned on the third day of trial. We reverse the conviction because the trial judge erroneously excused a juror during

deliberations and then erroneously designated one of the alternates to replace the juror without having the clerk draw the name of the substitute juror by lot as required by *R.* 1:8–2(d).

After the jury had been deliberating for almost an hour, it sent the judge a note that read, "There's one juror that doesn't want to be." The judge questioned the juror out of the presence of the other jurors as follows:

THE COURT: Miss Pollack, do I take it right that you don't want to participate?

MISS POLLACK: I just can't, can't make an opinion on this case—

THE COURT: Well—

MISS POLLACK: —Yes or no, you know. Then—they all are ganging up on me now.

THE COURT: I don't want to know—

MISS POLLACK: That's what—

THE COURT: Listen to me. I don't want to hear from you what they are saying in there. I don't want to know from you what your position is on this case.

My question of you is, are you willing to sit and discuss the case with them?

MISS POLLACK: No, I don't want to.

THE COURT: You don't want to?

MISS POLLACK: They have a feeling that I'm not going to go with them or something, is what they are saying.

THE COURT: Do you understand what your function is?

MISS POLLACK: Yes.

THE COURT: Are you willing to try to follow your oath or not?

MISS POLLACK: They just have an opinion that they don't want me. That's what I can see now, and I think I would be better if I went—I wouldn't have nothing in this.

THE COURT: When you're saying, they have a thing that they don't want you, are you saying that—

MISS POLLACK: I don't know what their problem is, but that's what they are saying, now.

THE COURT: Do you wish to continue as a juror or not?

MISS POLLACK: No.

THE COURT: Are you telling me that you are unable to continue because of some personal feeling you have about the case?

MISS POLLACK: Yes.

THE COURT: Can you tell me why?

MISS POLLACK: No, I just can't make an opinion, that's what I think.

THE COURT: You can't make an opinion?

MISS POLLACK: Opinion.

THE COURT: You can't decide it, you mean?

MISS POLLACK: That's right.

There then followed a sidebar discussion with counsel that led to concern about whether the juror understood what she was expected to do as a deliberating juror. The judge decided to ask her additional questions on the point:

THE COURT: Miss Pollack, do you understand it is the function of the 12 people who are in that room to talk about the case, talk about the facts they've heard and apply those facts to the law that I gave to the jury?

MISS POLLACK: Yes.

THE COURT: Pardon me?

MISS POLLACK: Yes.

THE COURT: Are you able to do that?

MISS POLLACK: I could do it, but they are thinking—they are thinking discounting me. It's not going to go their way. They have a feeling that I'm a hindrance to this opinion, final verdict or whatever you call it.

THE COURT: But you understand the nature of what you must do?

MISS POLLACK: Yes.

THE COURT: And are you willing to do that?

MISS POLLACK: Yes.

THE COURT: Now, that doesn't mean it could, necessarily, be easy or difficult in there to talk about it with the other people, but are you willing to abide by your oath?

MISS POLLACK: Yes.

THE COURT: Can you do that?

MISS POLLACK: Yes.

THE COURT: Now, before you told me that you couldn't get an opinion about this.

What did you mean by that?

MISS POLLACK: They just have a feeling that I'm not going—fit in with this case. That's what they are telling me.

THE COURT: Okay. Counsel, based upon what I'm hearing I'll leave her on, at this point in time, and see what happens.

The judge's decision at that time was clearly correct. From her responses to his questions it appeared that the juror did not want to continue participating in deliberations because she was made uncomfortable by pressure from the other jurors to vote before she had formed an opinion. The judge could not properly have acceded to her desire to be excused for that reason. Although it is not certain, her comments suggest that the jury had achieved unanimity except for her vote.

About a half hour after the jurors resumed deliberations, the judge brought them back to the court room to deal with their second note regarding Miss Pollack. The note read:

> Juror Number 9 does not understand the process. She changes her plea every 10 seconds. She wants to vote however we vote but she is very confused. We have stressed that she must vote the way she believes. We request an alternate juror, as it is felt that Juror Number 9 is not capable of expressing herself.

The judge had the jurors, other than Miss Pollack, acknowledge that they joined in the substance of the note, but he did not resolve with them the inconsistencies that the note presented. The note appears to describe Miss Pollack as being unable to make up her mind and at the same time too willing to vote with the others. The jurors may have meant that Miss Pollack honestly could not make up her mind but was willing to vote with them just to put an end to the pressure of deliberations. The judge was understandably wary about probing into the details of the jury's deliberations, yet the meaning of the note was left unclear.

The judge again questioned the juror out of the presence of the other jurors:

> THE COURT: Miss Pollack, I must speak to you, now, about your role as a juror. I am not going to ask you how you're voting because I do not want to be told how you're voting or how the other members of the jury are voting.
>
> Do you understand?
>
> MISS POLLACK: Yes.
>
> THE COURT: But the jury, the other 11 members of the jury have indicated to me their belief that you are having difficulty knowing what you're doing in there.
>
> Do you understand that you must decide the case with them? Are you able to do that?
>
> MISS POLLACK: I don't think so.
>
> THE COURT: You do not.
>
> Are you able to communicate with them and discuss the case?
>
> MISS POLLACK: I did, but everybody else has a different opinion—
>
> THE COURT: All right.
>
> MISS POLLACK: —On account of me. I don't want it to be a mistrial, what they are saying in there—
>
> THE COURT: I take care of that.

My question is and my inquiry has to be if you are able to function. They've indicated to me there's a problem in there that they say that you are changing your mind every 10 seconds, for example, about this particular case.

Is that happening in there?

MISS POLLACK: Yes.

Although by no means clear from the colloquy, a reasonable interpretation of the juror's responses is that there was a deadlock in the deliberations whereby the other jurors had a "different opinion" from hers and were putting pressure on her to vote with them to avoid "a mistrial."

The judge thereupon excused the juror after finding that she was not able to function as a juror. He made the following findings:

THE COURT: Earlier, when I interviewed her, I was not confident that enough was in the record for me to be permitted to remove her from the jury. The jury's note, however, quite clearly indicates she's not functional in what she's doing there. I earlier told you that the first day of the trial when I went home I followed her down the stairway and I heard her talking to herself.[1] Apparently, that's not been unknown to anybody else. You noticed it in terms of the trial,[2] and the reporter has indicated to me that she's heard her talking to herself during the same period of time.

THE REPORTER: Yes, Judge.

THE COURT: Given all this information and the lady's responses to me, it seems to me, quite clearly now, that the lady is, somewhat, bizarre. Intelligence, per se, is not controlling, but her intelligence does not seem to be overly acute. I don't think, at this point in time, that she's able and functional to know what she's doing to discuss the case intelligently and to do her function and her job.

---

1 The reference is to a comment the judge made when discussing with counsel the jury's first note. He then said, "I do recall the afternoon of the first day we were on the case, walking down the stairway after some of the jurors and the lady was making some sounds to herself. I'm not sure if she was speaking to herself or I—don't know what she was doing."

2 Defendant's attorney, who argued against excusing the juror, stated that he did not observe her acting strangely. He argued, "The observations, however, that I did make when the Court asked her questions was that she was firm, as far as the answers were concerned. It seems like she explained to the Court that the other members of the jury wanted to make her go along and she did not want to go along and that's basically, the problem she has."

After he excused the juror, the judge designated one of the alternates, the first chosen, to take her place. He then instructed the reconstituted jury to begin its deliberations anew. The jury announced its guilty verdict in little less than an hour.

In rare circumstances *R.* 1:8–2(d) permits a trial judge to excuse a deliberating juror and replace him or her with an alternate. The relevant portion of the rule provides:

> If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or a juror is discharged by the court because he is ill or otherwise unable to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged.

"The rule must be strictly construed and applied only where compelling circumstances require it." *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.*2d 555 (App.Div.1978). "[T]he 'unable to continue' language of the rule must be strictly construed and must ordinarily be limited to compelling circumstances which are exclusively personal to the juror in question. . . ." *State v. Trent,* 157 *N.J.Super.* 231, 240, 384 *A.*2d 888 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.*2d 1271 (1979).

We have three concerns. Procedurally, the substitute juror was not selected by lot by the clerk, a clear violation of the rule. Substantively, we are not convinced from this record, as was the trial judge, that the excused juror was "ill or otherwise unable to continue." Finally, it appears that the jury had progressed so far in its deliberations that by the time the juror was excused the other jurors had agreed on a verdict thereby making them less receptive to the views of a substitute juror.

█ Substitute jurors must be chosen by lot to avoid the appearance that the judge favored one alternate over another. Here the judge selected the person who had been chosen first as an alternate. Although the original selection process was by lot, there is no evidence that the judge's decision to designate the first chosen was a uniform practice. There remains the appearance that the judge may have made the selection by

personal choice rather than at random. The judge should have followed the procedure prescribed in the rule.

■ In considering the substantive issues, we reemphasize that courts are reluctant to invalidate jury deliberations, decertify a deliberating juror, and substitute a new juror who had not participated in the previous deliberations. Errors related to juror substitution are considered so serious that they are cognizable as plain error. *State v. Corsaro*, 107 *N.J.* 339, 346–47, 526 *A.*2d 1046 (1987). The Supreme Court sanctioned the dismissal of a nervous deliberating juror in *State v. Miller*, 76 *N.J.* 392, 388 *A.*2d 218 (1978), but only because the juror stated that his emotional condition kept him from rendering a fair verdict. The juror there was excused without objection. *Id.* at 401, 388 *A.*2d 218. Here, the juror merely complained that she felt pressured by the other jurors and therefore wanted to be excused. She did not state that she was unable to render a fair verdict. Defendant's attorney objected to her being excused.

■ The judge apparently concluded that the excused juror was dysfunctional largely because she was unable to vote for conviction or acquittal. A juror is not dysfunctional simply because he or she is not prepared to vote after the other jurors have made up their minds. We note that the jury had been deliberating less than an hour before the other jurors complained of the excused juror's indecisiveness. They renewed their complaint less than a half hour later. It is not always clear whether a juror cannot vote because of illness or an intractable inability to understand the function of a juror, or because the juror is honestly indecisive in weighing the evidence against the State's heavy burden of proof. Where there is any doubt, before considering whether to discharge such a juror as hopelessly dysfunctional, a trial judge should have the jury resume deliberations after reminding them of the State's burden of proof and carefully explaining that jurors should vote "guilty" or "not guilty" depending on whether they are con-

vinced beyond a reasonable doubt that the State has proven all the elements of the offense being considered.

The fact that the juror was observed momentarily talking to herself is not sufficient evidence to excuse her under the rule as "ill or otherwise unable to continue."

■ Although the jurors had not deliberated very long before the substitution, it appears from the record that, except for the excused juror, they had agreed on a verdict. In *State v. Corsaro, supra,* 107 *N.J.* at 351, 526 *A.*2d 1046, the Supreme Court identified inherent problems that arise when substituting a juror at a late stage in deliberations:

> There is a grey area between jury deliberations and determinations. The *Miller* [*State v. Miller, supra,*] Court's concern was that if the jury deliberates for an extended period of time, it will have progressed so far in its deliberations that it will have reached determinations. Hence, at that juncture, the substituted juror will not have "had the benefit of the deliberations of the other 11," [citation omitted] and may indeed be pressured by the amount of time the jury has deliberated and by the extent of their progress to conform to their findings and verdict.

It is fair to conclude here that the jury was reconstituted after the remaining eleven jurors had come to an agreement thus subjecting the substituted juror to the unwarranted pressures referred to in *Corsaro.* In short, even if there were cause to excuse Miss Pollack, it may have been too late to avoid declaring a mistrial.

We realize that we were not there and therefore have not had the benefit of observing the demeanor of the excused juror, which may have added significantly to the judge's determination to excuse her. It may be that none of the three reasons we have discussed standing alone requires us to reverse this judgment. However, their cumulative weight persuades us that the judgment must be reversed.

Reversed and remanded for a new trial.