643 A.2d 582

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. RAFAEL
VALENZUELA, DEFENDANT–RESPONDENT.

Argued January 5, 1994—Decided July 13, 1994.

*Carol M. Henderson,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Cynthia N. McKee,* Designated Counsel, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

STEIN, J.

In this appeal we consider whether the trial court properly exercised its discretion pursuant to *Rule* 1:8–2(d) in discharging a juror and substituting an alternate juror after the jury had begun deliberations. The reconstituted jury convicted defendant of second-degree sexual assault and acquitted him of fourth-degree theft. The Appellate Division reversed the conviction, citing as errors the dismissal of a juror who was not clearly unable to continue, the court's failure to choose by lot which alternate juror would replace the dismissed juror, and the substitution of a juror at a stage in the deliberations when it appeared the other eleven jurors had reached agreement. 262 *N.J.Super.* 392, 398, 621 *A.*2d 63 (1993). The Appellate Division, concluding that the cumulative weight of those errors warranted reversal, remanded for a new trial. *Id.* at 400, 621 *A.*2d 63. We granted the State's petition for certification, 133 *N.J.* 446, 627 *A.*2d 1150 (1993).

I

A grand jury indicted defendant, Rafael Valenzuela, on charges of first-degree aggravated sexual assault and second-degree robbery stemming from his alleged rape of a young woman acquain-

tance who had agreed to accompany him to a Department of Motor Vehicles office to act as an interpreter. The trial progressed for three days before a fourteen-member jury panel. At the close of the State's case, the trial court, finding no evidence that force had been used during the alleged theft of $500 from the victim's coat pocket, reduced the robbery charge to the lesser-included offense of fourth-degree theft and also reduced the first-degree aggravated-sexual-assault charge to second-degree sexual assault.

The defense rested on the third day of trial. After instructing the jury on the applicable law, the trial court reduced the jury to twelve members by selecting by lot the names of two jurors. The court designated those jurors, in the order they were selected, as the first and second alternate jurors. The jury left the courtroom to deliberate at 11:10 a.m. The court retained the alternate jurors in a separate location, stating, "You might be needed if somebody becomes ill on the jury." Fifty minutes later the jury sent a note out to the court to the effect that one member "doesn't want to be" a juror. The court brought the jury out, determined that Juror Number 9 was the reluctant juror, and then questioned Juror Number 9 out of the presence of the other jury members.

THE COURT: Miss Pollack, do I take it right that you don't want to participate?

MISS POLLACK: I just can't, can't make an opinion on this case—

THE COURT: Well—

MISS POLLACK: —Yes or no, you know. Then—they all are ganging up on me now.

THE COURT: I don't want to know—

MISS POLLACK: That's what—

THE COURT: Listen to me. I don't want to hear from you what they are saying in there. I don't want to know from you what your position is on this case.

My question of you is, are you willing to sit and discuss the case with them?

MISS POLLACK: No, I don't want to.

THE COURT: You don't want to?

MISS POLLACK: They have a feeling that I'm not going to go with them or something, is what they are saying.

THE COURT: Do you understand what your function is?

MISS POLLACK: Yes.

THE COURT: Are you willing to try to follow your oath or not?

MISS POLLACK: They just have an opinion that they don't want me. That's what I can see now, and I think I would be better if I went—I wouldn't have nothing in this.

THE COURT: When you're saying, they have a thing that they don't want you, are you saying that—

MISS POLLACK: I don't know what their problem is, but that's what they are saying, now.

THE COURT: Do you wish to continue as a juror or not?

MISS POLLACK: No.

THE COURT: Are you telling me that you are unable to continue because of some personal feeling you have about the case?

MISS POLLACK: Yes.

THE COURT: Can you tell me why?

MISS POLLACK: No, I just can't make an opinion, that's what I think.

THE COURT: You can't make a opinion?

MISS POLLACK: Opinion.

THE COURT: You can't decide it, you mean?

MISS POLLACK: That's right.

The court then conferred with counsel. The prosecutor stated that he had observed the juror during trial talking to herself and "acting * * * somewhat differently [from] anybody else I've ever seen on a jury." The prosecutor also stated, "I just feel she doesn't want to be with the rest of the jurors." Defense counsel observed that Miss Pollack had been "attentive to the case" and that her responses to the court's questioning suggested "a bitter dispute between jurors." Defense counsel also noted, referring to *Rule* 1:8–2(d), that the juror did not seem "ill or, certainly, she's not dead or disabled and, basically, I think she has to go there and make up her mind * * *." The judge noted that on one occasion he had observed the juror outside the courtroom "making some sounds to herself."

The court questioned Juror Number 9 further regarding her understanding of a juror's function and her willingness to participate:

THE COURT: Miss Pollack, do you understand it is the function of the 12 people who are in that room to talk about the case, talk about the facts they've heard and apply those facts to the law that I gave to the jury?

MISS POLLACK: Yes.

THE COURT: Pardon me?

MISS POLLACK: Yes.

THE COURT: Are you able to do that?

MISS POLLACK: I could do it, but they are thinking—they are thinking discounting me. It's not going to go their way. They have a feeling that I'm a hindrance to this opinion, final verdict or whatever you call it.

THE COURT: But you understand the nature of what you must do?

MISS POLLACK: Yes.

THE COURT: And are you willing to do that?

MISS POLLACK: Yes.

THE COURT: Now, that doesn't mean it could, necessarily, be easy or difficult in there to talk about it with the other people, but are you willing to abide by your oath?

MISS POLLACK: Yes.

THE COURT: Can you do that?

MISS POLLACK: Yes.

THE COURT: Now, before you told me that you couldn't get an opinion about this.

What did you mean by that?

MISS POLLACK: They just have a feeling that I'm not going—fit in with this case. That's what they are telling me.

Following that colloquy, the court determined to leave Juror Number 9 on the jury, stating that the record did not contain enough information to warrant her removal. The court instructed the jury to return to the jury room, to discuss the case, and to apply the law to the facts in an effort to reach a decision.

Less than half an hour later, the court received a second note from the jury. It read:

Juror Number 9 does not understand the process. She changes her plea every 10 seconds. She wants to vote however we want to vote, but she is very confused. We have stressed that she must vote the way she believes. We request an alternate juror, as it is felt that Juror Number 9 is not capable of expressing herself.

The foreperson indicated that the note represented the opinion of all the jurors. The court questioned Juror Number 9 out of the presence of the jury:

THE COURT: Miss Pollack, I must speak to you, now, about your rol[e] as a juror. I am not going to ask you how you're voting because I do not want to be told how you're voting or how the other members of the jury are voting.

Do you understand?

MISS POLLACK: Yes.

THE COURT: But the jury, the other 11 members of the jury have indicated to me their belief that you are having difficulty knowing what you're doing in there.

Do you understand that you must decide the case with them? Are you able to do that?

MISS POLLACK: I don't think so.

THE COURT: You do not.

Are you able to communicate with them and discuss the case?

MISS POLLACK: I did, but everybody else has a different opinion—

THE COURT: All right.

MISS POLLACK: On account of me. I don't want it to be a mistrial, what they are saying in there—

THE COURT: I take care of that.

My question is and my inquiry has to be if you are able to function. They've indicated to me there's a problem in there that they say that you are changing your mind every 10 seconds, for example, about this particular case.

Is that happening in there?

MISS POLLACK: Yes.

At sidebar, defense counsel again referred to the court rule for discharge of a juror, arguing that this juror did not fit the criteria. He stated that the juror had responded firmly to questions, that she had been clear in her answers, and that she apparently had indicated to the court that she held a different opinion from the other jury members. Defense counsel suggested that the appropriate course would be to explain to the juror that "she has a personal conviction," and that she must discuss the case with the other jurors and try to make a determination with them, but that ultimately "[s]he has to go according to her mind." The prosecutor disagreed, concluding that the jury's note and the juror's responses to the court's questioning indicated not that the juror was voting differently from the other jurors, but that she did not "understand the process" and could not "function in the jury

process," and, therefore, that the court had sufficient cause to discharge her.

The court, over defense counsel's objection, removed the juror:

THE COURT: Earlier, when I interviewed her, I was not confident that enough was in the record for me to be permitted to remove her from the jury. The jury's note, however, quite clearly indicates she's not functional in what she's doing there. I earlier told you that the first day of the trial when I went home I followed her down the stairway and I heard her talking to herself. Apparently, that's not been unknown to anybody else. You [the prosecutor] noticed it in terms of the trial, and the reporter has indicated to me that she's heard her talking to herself during the same period of time.

THE REPORTER: Yes, Judge.

THE COURT: Given all this information and the lady's responses to me, it seems to me, quite clearly now, that the lady is, somewhat, bizarre. Intelligence, per se, is not controlling, but her intelligence does not seem to be overly acute. I don't think, at this point in time, that she's able and functional to know what she's doing to discuss the case intelligently and to do her function and her job.

The court dismissed the juror on its own motion, presumably because the court considered her to be a juror "unable to continue," under the language of *Rule* 1:8–2(d). The court directed the juror who had been designated the first alternate to take the discharged juror's place. The court instructed the reconstituted jury that it must "begin * * * work anew" and that it should not "take any preconceived notions about the case into that room, but * * * begin again." Fifty-five minutes later the jury returned with a verdict, finding defendant guilty of sexual assault and not guilty of theft. The court later sentenced defendant to ten years' imprisonment with a four-year period of parole ineligibility.

The Appellate Division reversed the conviction, stating: "Substantively, we are not convinced from this record, as was the trial judge, that the excused juror was 'ill or otherwise unable to continue.'" 262 *N.J.Super.* at 398, 621 *A.*2d 63 (quoting *R.* 1:8–2(d)). It concluded that the trial court improperly had discharged the juror. On the basis of that error, as well as the trial court's failure to have the clerk select the substitute juror by lot, and the substitution of an alternate juror after the remaining eleven jurors had progressed in deliberations to a stage approaching agreement

on a verdict, the Appellate Division reversed defendant's conviction and remanded for a new trial. *Id.* at 400, 621 *A.*2d 63.

## II

*Rule* 1:8–2(d) governs the impaneling of additional jurors and the discharge and substitution of jurors. Concerning dismissal of a juror after deliberations have commenced, the *Rule* provides:

> If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or a juror is discharged by the court because he is ill or otherwise unable to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

The *Rule* attempts to strike a balance between the need for judicial economy, especially in the context of lengthy trials, and the fundamental right of defendants to a fair trial by jury. *State v. Trent,* 157 *N.J.Super.* 231, 238–39, 384 *A.*2d 888 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.*2d 1271 (1979). The need for judicial economy became evident when the prior *Rule* regarding impaneling of alternate jurors was in effect. Under that *Rule* the practice was to dismiss the alternate jurors once the court submitted the case to the jury. *See Report of Supreme Court Committee on Criminal Procedure,* 95 *N.J.L.J.* 341, 356 (Apr. 13, 1972). Thus, if a juror could not complete deliberations due to illness or some other reason, the court, barring acceptance of a smaller jury by both parties, had to declare a mistrial. *Ibid.* The Sub–Committee on Jury Deliberations of the Supreme Court Committee on Criminal Procedure recommended in 1972 that the *Rule* be amended to allow for the substitution of a juror after deliberations had begun in cases in which a juror dies, becomes ill, or is unable to perform the duties of a juror. This Court followed that recommendation in amending *Rule* 1:8–2(d).

Balanced against the interests of conserving judicial resources is the constitutional right of trial by a fair and impartial jury, *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 9, which must be

"scrupulously protected from encroachment or impairment * * *." *State v. Simon,* 79 *N.J.* 191, 199, 398 *Å.*2d 861 (1979). In *State v. Miller,* 76 *N.J.* 392, 406, 388 *A.*2d 218 (1978), we held that *Rule* 1:8–2(d) does not on its face violate a defendant's constitutional rights. Because the circumstances in which a juror can be excused pursuant to the *Rule*—death, illness, or inability to continue deliberations—"relate exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself, they are ordinarily not circumstances having the capacity to affect the substance or the course of the deliberations." *Trent, supra,* 157 *N.J.Super.* at 239, 384 *A.*2d 888. Therefore, substitution of a juror under those circumstances in most cases does not impair a defendant's right to trial by a fair and impartial jury. *Ibid.; see also Commonwealth v. Connor,* 392 *Mass.* 838, 467 *N.E.*2d 1340, 1346 (1984) (holding under rule similar to 1:8–2(d) that "good cause" for discharge of juror includes only reasons personal to deliberating juror, having nothing to do with case issues or with juror's relationship with fellow jurors).

 The *Rule,* however, is to be employed sparingly. "[T]he potential prejudicial impact upon the integrity of the jury deliberation process would mandate that the rule be invoked only as a last resort mechanism to avoid the deplorable waste of time, effort and money inherent in a mistrial." *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.*2d 555 (App.Div.1978). *See also State v. Corsaro,* 107 *N.J.* 339, 346, 526 *A.*2d 1046 (1987) (noting potential for introduction of improper extraneous influences in substitution of jurors).

> [T]he "unable to continue" language of the rule must be strictly construed and must ordinarily be limited to compelling circumstances which are exclusively personal to the juror in question, and hence which do not and which by their nature cannot raise the specter of either a jury taint or a substantive interference with the ultimate course of the deliberations beyond that necessarily implicit in the effect of new personalities on group dynamics.
>
> [*Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888.]

 A trial court cannot discharge a juror merely because that juror is one "whose position is at odds with the rest of the

jury." *State v. Paige*, 256 *N.J.Super.* 362, 380–81, 607 *A.*2d 164 (App.Div.), *certif. denied*, 130 *N.J.* 17, 611 *A.*2d 655 (1992). *See also Connor*, *supra*, 467 *N.E.*2d at 1345 ("Great care must be taken to ensure that a lone dissenting juror is not permitted to evade his responsibilities."). The appropriate course when a juror indicates that the jury is deadlocked is to inquire of the jury whether further deliberation will likely result in a verdict. *See State v. Hunt*, 115 *N.J.* 330, 380, 558 *A.*2d 1259 (1989). When the difference of opinion between members of the jury is clearly intractable, the trial court should not repeatedly send a dissenting juror back into the jury room to deliberate, but rather should declare a mistrial. *See State v. Czachor*, 82 *N.J.* 392, 407, 413 *A.*2d 593 (1980) (approving American Bar Association recommendations stating that trial court should not repeatedly instruct jury reporting definite deadlock to continue to deliberate after reasonable period of deliberations and that court may discharge hung jury if agreement does not appear reasonably probable); *State v. Vergilio*, 261 *N.J.Super.* 648, 655, 619 *A.*2d 671 (App.Div.1993) (holding that returning distraught dissenting juror to jury room and instructing jury to continue deliberations was unduly coercive).

In *Trent, supra*, after the jury had been deliberating for six hours, the trial court excused a juror who stated that she was "getting sick." 157 *N.J.Super.* at 235, 384 *A.*2d 888. The juror, in response to the court's questioning, had said that she was "nervous," "too emotional," felt like she "want[ed] to spit up," and could not decide the case because she identified the defendant with her own son. *Id.* at 235–36, 384 *A.*2d 888. Although the juror had indicated that she might feel better in the morning, the trial court excused the juror, stating " 'she is physically and emotionally disturbed and * * * I don't think she can properly and adequately carry out her duties as a juror * * *.' " *Id.* at 236–37, 384 *A.*2d 888. The Appellate Division noted that dispersing the jury for the evening might have been "a prudent course to follow," *id.* at 241, 384 *A.*2d 888, but nonetheless upheld the conviction, determining that the trial court reasonably had exer-

cised its discretion in removing the juror. The court observed that the juror's incapacity was attributable only to personal characteristics of that juror, and that the record did not demonstrate that "her distress or its cause tainted or infected the jury as a whole * * *." *Id.* at 240, 384 *A.*2d 888. We reversed the Appellate Division's judgment on the basis that the trial court had failed to charge the reconstituted jury that it must begin deliberations anew. *Trent, supra,* 79 *N.J.* at 257, 398 *A.*2d 1271. Indeed, the trial court had instructed the substituted juror to " 'continue with deliberations with the other jurors.' " *Id.* at 253, 398 *A.*2d 1271. Because we reversed on that ground, we did not reach the issue whether the trial court had mistakenly exercised its discretion in discharging the juror. *Ibid.*

In *Miller, supra,* we determined that the trial court had properly exercised the discretion granted by *Rule* 1:8-2(d) in excusing a juror who requested dismissal because he was very nervous and his nervousness was affecting his judgment. In response to the trial court's questioning, the juror stated that he did not think that he could render a fair verdict. The trial court discharged the juror and substituted an alternate. 76 *N.J.* at 401-02, 388 *A.*2d 218. We determined that that decision was reasonable, stating that "good cause appeared when the juror in question stated that in his then nervous and emotional condition, he did not think he could render a fair verdict." *Id.* at 406-07, 388 *A.*2d 218. *See also People v. Collins,* 17 *Cal.*3d 687, 131 *Cal.Rptr.* 782, 552 *P.*2d 742 (1976) (upholding under rule similar to 1:8-2(d) dismissal of juror who stated that she could not perform her duty because she was too emotional), *cert. denied,* 429 *U.S.* 1077, 97 *S.Ct.* 820, 50 *L.Ed.*2d 796 (1977). We recognized in *Miller,* however, that "[t]he rule is discretionary with the trial court because a situation might arise where it would be unwise to utilize this procedure." 76 *N.J.* at 407, 388 *A.*2d 218.

### III

The trial court excused Juror Number 9 because it believed she was unable to function in the jury room. The court stated that it

based its conclusion on the jury's second note, the juror's demeanor and responses to the court's questioning, and the observations the court and others had made of the juror's behavior. The court made clear that it considered the juror to be "somewhat bizarre" and not of "overly acute" intelligence.

The court dismissed the juror despite her statements that she understood her function, that she was willing to abide by her oath, and that she was willing and able to apply the law. As the Appellate Division noted, the juror never stated "that she was unable to render a fair verdict." 262 *N.J.Super.* at 399, 621 *A.*2d 63. The jury's second note indicated both that the juror constantly changed her mind and that she wanted to vote the same way that the other members of the jury were voting. However, although the juror herself stated that she was going back and forth in her vote, she did not suggest that she wanted to vote for the same outcome as the other jury members.

The record also contains evidence that the circumstances leading to the jury's and the juror's desire for discharge may have stemmed from interactions in the jury room. Many of the juror's responses to the court's questioning indicate that she held a different position from that of the other jurors. The juror stated in the colloquies with the court, "they all are ganging up on me now" and "[t]hey have a feeling that I'm not going to go with them * * *." In response to the court's question regarding whether the juror could apply the facts to the law as given, the juror responded: "I could do it, but they are thinking—they are thinking discounting me. It's not going to go their way. They have a feeling that I'm a hindrance to this opinion, final verdict or whatever you call it." After the jury sent out the second note, the juror responded to the court's query regarding her ability to communicate with the other jurors and discuss the case by stating, "I did, but everybody else has a different opinion * * * [o]n account of me. I don't want it to be a mistrial, what they are saying in there * * *."

■ The question before us is whether on this record the court reasonably exercised its discretion in removing the juror. We hold that it did not. The record on which a court may excuse a deliberating juror must reveal with greater clarity that a juror cannot proceed with deliberations and fulfill the function of a juror, particularly when the record contains any suggestion that the problems regarding the juror stem from interactions with the other jurors and not from circumstances "exclusively personal to the juror in question * * *." *Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888. If a court is uncertain whether a juror is unable to continue, the court should question the juror in sufficient detail to establish a record adequate to inform the trial court, as well as a reviewing court, whether the juror possesses the intellect and the emotional stability to discharge the duty of a juror. On that issue, a trial court should not rely on instinct. Here the juror indicated that she was unable to decide the case with the other jurors; but whether that inability resulted from factors personal to the juror, from the failure of the State to meet its burden of proof, or from the juror's disagreement with the other jurors was never established. *See Opinion of the Justices (Alternate Jurors)*, 137 *N.H.* 100, 623 *A.*2d 1334, 1338 (1993) (stating that prior to excusing deliberating juror, trial court should question juror and make findings on record that not only establish meritorious reason for discharge but also eliminate improper reasons).

■ We agree generally with the Appellate Division that
[i]t is not always clear whether a juror cannot vote because of illness or an intractable inability to understand the function of a juror, or because the juror is honestly indecisive in weighing the evidence against the State's heavy burden of proof. Where there is any doubt, before considering whether to discharge such a juror as hopelessly dysfunctional, a trial judge should have the jury resume deliberations after reminding them of the State's burden of proof and carefully explaining that jurors should vote "guilty" or "not guilty" depending on whether they are convinced beyond a reasonable doubt that the State has proven all the elements of the offense being considered.

[262 *N.J.Super.* at 399–400, 621 *A.*2d 63.]

Thus, we hold that a juror cannot be discharged as "unable to continue" unless the record adequately establishes that the juror

suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members. If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations. If the jury remains unable to return a verdict, the court should determine whether further deliberation would allow the jury to reach a verdict. If the jury indicates intractable deadlock, the court should declare a mistrial.

Because this record does not clearly indicate that the juror was "unable to continue," and based on implications in the record that the juror's problems related not only to personal circumstances but also to factors arising from the juror's interactions with the other jurors, we hold that the trial court abused its discretion in discharging Juror Number 9. We emphasize as we did in *Trent, supra,* that the fundamental right of fair and impartial jury deliberations must be zealously protected. 79 *N.J.* at 257, 398 *A.*2d 1271. That protection is not ensured when a court discharges a juror under circumstances that bring into question the integrity of the jury's deliberative function.

## IV

Because we conclude that the court improperly discharged Juror Number 9, we need not decide whether the jury had progressed too far in its deliberations to permit the substitution of an alternate juror and whether the procedure the court employed in selecting the substitute juror was prejudicially defective. We discuss briefly, however, the law applicable to those issues to emphasize the cautious approach that courts must take in substituting a juror on a deliberating jury to ensure that the integrity of jury deliberations is preserved.

With regard to the timing of juror substitutions, we reiterate that there may be a point at which the jury

will have progressed so far in its deliberations that it will have reached determinations. Hence, at that juncture, the substituted juror will not have "had the benefit of the deliberations of the other 11," *People v. Collins, supra,* 552 *P.*2d at

746[, *quoted in* ] *Trent, supra,* 79 *N.J.* at 256[, 398 *A.*2d 1271], and may indeed be pressured by the amount of time the jury has deliberated and by the extent of their progress to conform to their findings and verdict.

[*Corsaro, supra,* 107 *N.J.* at 351, 562 *A.*2d 1046.]

In *Corsaro,* the jury had returned a partial verdict and had reconvened to deliberate on further charges. The trial court, with the acquiescence of the defendants, discharged a juror who appeared intoxicated and substituted an alternate juror. The court then instructed the jury to begin deliberations anew on the remaining charges. We held that a juror could not be substituted after a jury has returned a partial verdict because at that point "the deliberative process has progressed for such a length of time or to such a degree that * * * [a] new juror is likely to be confronted with closed or closing minds." *Id.* at 352, 562 *A.*2d 1046.

Although in *Corsaro* we recognized "a grey area between jury deliberations and determinations," *id.* at 351, 562 *A.*2d 1046, we cautioned that "[t]o allow juror substitution at an advanced stage of deliberations would be to sanction a rift in the collectivity and mutuality of the jury's deliberations and to impose precisely the kind of extraneous influence upon the deliberative process that this Court has forbidden." *Id.* at 350–51, 562 *A.*2d 1046. In *Miller, supra,* the Court noted that "[t]he longer the period of time the jury deliberates, the greater is the possibility of prejudice should a juror be substituted or replaced." 76 *N.J.* at 407, 388 *A.*2d 218. We found that the defendant there had not been prejudiced by the substitution of a juror after the jury had been deliberating for about an hour and a quarter. *Id.* at 401, 407, 388 *A.*2d 218; *see also Lipsky, supra,* 164 *N.J.Super.* 39, 395 *A.*2d 555 (finding substitution after almost five hours of deliberation not abuse of discretion, but reversing conviction on court's failure to instruct jury to begin deliberations anew). The concern in determining whether substitution can take place at a given point in the deliberations is not merely the length of time that the jury has deliberated but the effect that the progress in deliberations will

have on the reconstituted jury's ability truly to begin deliberations anew. *See Corsaro, supra,* 107 *N.J.* at 354, 562 *A.*2d 1046.

With regard to selection of an alternate juror in circumstances in which substitution for a deliberating juror is appropriate, *Rule* 1:8–2(d) provides that the trial court "may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged." Although the *Rule* states that when a juror is discharged, the court "may" direct the clerk to draw an alternate, that permissive language relates to the court's discretion either to substitute a juror or to declare a mistrial. The Sub–Committee on Jury Deliberations of the Supreme Court Committee on Criminal Procedure, in recommending adoption of the amended rule,

> concluded that the conjectural dangers of substitution should not militate against the decision to permit it. Accordingly, the rule was drawn in permissive terms, authorizing the court in its discretion first to retain the alternate jurors and second to substitute an alternate, by lot, for a juror unable to continue.
>
> [Pressler, *Current N.J. Court Rules,* comment 5 on *R.* 1:8–2(d) (1993).]

Contrary to *Rule* 1:8–2(d), the trial court did not select the substitute juror by lot, but instructed the designated first alternate to take the discharged juror's place. The court's original designation of the alternates was by lot and the court's regular practice may have been to substitute the designated first alternate if the need for substitution arose. The record contains no evidence of the court's usual practice nor any evidence that the court's substitution was improperly motivated. Because of our disposition, we need not decide whether that procedural defect standing alone could have sufficiently prejudiced defendant's rights to warrant reversal of his conviction. We emphasize, however, that in selecting substitute jurors, trial courts should follow the procedure prescribed by *Rule* 1:8–2(d) to avoid the appearance of a preference for one alternate over the other.

V

The judgment of the Appellate Division is affirmed.

*For affirmance and reversal*—Chief Justice WILENTZ and Justices STEIN, CLIFFORD, HANDLER, POLLOCK, O'HERN, and GARIBALDI—7.

*Opposed*—None.