288 N.J. Super. 390 (1996)
672 A.2d 734
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BISMALLAH HOLLOWAY,[1] DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted January 17, 1996.
Decided March 15, 1996.
*392 Before Judges BAIME, VILLANUEVA and KIMMELMAN.
Susan L. Reisner, Public Defender, attorney for appellant (Lisa J. Rusciano, Designated Counsel, of counsel and on the brief).
Deborah T. Poritz, Attorney General of New Jersey, attorney for respondent (John E. Adams, Jr., Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
*393 Defendant appeals from his conviction of two counts of third degree distribution of cocaine, N.J.S.A. 2C:35-5b(3) (counts one and three); and two counts of third degree distribution of cocaine within 1,000 feet of school property, N.J.S.A. 2C:35-5 and N.J.S.A. 2C:35-7 (counts two and four). We affirm.
On September 2, 1992, Detective Gary Nash of the Essex County Sheriff's Department, Bureau of Narcotics, while working in an undercover capacity accompanied another individual to a restaurant known as the Munchie Shop on Springfield Avenue, in Newark, New Jersey, where defendant worked. At that time, the person with Detective Nash, whom Nash termed a confidential informant, told defendant that he wanted to buy drugs from him. Defendant responded that he did not keep any at the Munchie shop. Defendant did say to "catch up with him later on," but Detective Nash did not hear where.
Later that day at approximately 5:25 p.m., Detective Nash went to an apartment on South 17th Street to purchase cocaine. At that location, which was within 1,000 feet of a school, the detective went up the stairs to the second floor with the confidential informant and knocked. Defendant answered the door. Detective Nash told defendant that he wanted to get seven "bottles," meaning seven vials of cocaine. Defendant told him to wait a minute, closed the door, and returned moments later with a bag that contained approximately seventy vials of cocaine. Defendant extracted seven vials from the bag and gave them to Detective Nash in exchange for $60. After completing the purchase, Detective Nash exited the area and met with a backup unit at a location in Irvington. He was shown a photograph and identified defendant as the person from whom he had just purchased cocaine.
*394 On September 4, 1992, Detective Nash again was going to the apartment on South 17th Street when he saw defendant on the corner of 17th Street and Avon Avenue. At that time, Detective Nash was with Shawn Wilson. Defendant asked Nash what he needed, and Nash told defendant he wanted thirteen vials of cocaine. Defendant told the detective to wait there, which again was within 1,000 feet of a school, and walked north, leaving the detective's view before Nash subsequently saw defendant enter a house.
Defendant returned with thirteen vials of cocaine and told Detective Nash they would cost $160. The detective gave defendant $160 in bills which had been previously marked and photocopied. Detective Nash put the thirteen vials in his pocket and left the area. He returned to his vehicle and communicated with a backup unit, giving them defendant's location and a description of what defendant was wearing.
After receiving that information, Detective Ronald Tutela of the backup unit team went to that area and observed defendant standing on the corner of Madison and 17th Streets. Detective Tutela detained defendant until Detective Nash rode by the area and radioed that defendant was the person who sold him the cocaine on that day and on September 2. Defendant was then placed under arrest. A search of defendant revealed no drugs or money.
Shawn Wilson, defendant's friend and a convicted drug offender, testified as a defense witness. He claimed to have been with a person known to him as Alvin Lawson on September 2 at around 2:30 or 3:00 p.m. when he went to see defendant at the Munchie Shop. At that time he attempted to buy drugs from the defendant, who told him that he was not selling. Wilson then claimed that after leaving defendant he purchased drugs from someone named Chris. Wilson also claimed to have gone to defendant's *395 house on September 4 and asked defendant if he was selling drugs, to which defendant replied he was not. Wilson claimed that Alvin Lawson was his uncle and was not a police officer, and at no time did he bring a police officer to buy drugs from defendant.
Defendant testified that between 2:00 and 2:30 p.m. on September 2, Wilson and Detective Nash came to see him at the Munchie Shop and Wilson asked him if he was selling drugs. Defendant replied that he was not. According to defendant, at the time later that day when he was supposedly selling cocaine to Detective Nash, he was still working at the Munchie Shop. He also said that on September 4 at around 12:00 p.m., he was home when Wilson and Detective Nash came to his residence and Wilson asked him again if he was selling. Defendant repeated that he was not and denied selling any drugs to Detective Nash.
Defendant admitted, however, that he had been convicted of illegally selling narcotics to an undercover police officer in 1991 but denied having sold them out of his home. In rebuttal, the State presented the testimony of a detective to whom defendant had sold narcotics in 1991. That detective testified that during the transaction defendant went into his house, came out, and then gave him two vials of cocaine.
On the basis of the foregoing evidence, the jurors convicted defendant of two counts of distribution of cocaine and two counts of distribution of cocaine within 1,000 feet of school property. The jury rejected defendant's theory that the State "set up" defendant with drug charges because they wanted to obtain information from him about his brother who was under investigation by the prosecutor's office at that time in connection with the shooting of a police officer.[2]
The trial court granted the State's motion for a mandatory extended term pursuant to N.J.S.A. 2C:43-6f, and after merging *396 the conviction on count one with the conviction on count two, sentenced defendant to the custody of the Commissioner of the Department of Corrections to an extended ten-year term of imprisonment with a mandatory minimum four-year term to be served without eligibility for parole. The trial court also merged the conviction on count three with the conviction on count four and sentenced defendant to a concurrent five-year term of imprisonment with three years to be served without eligibility for parole. The trial court imposed aggregate Violent Crimes Compensation Board (VCCB) penalties of $100, mandatory aggregate Drug Enforcement and Demand Reduction (DEDR) penalties of $2,000, aggregate laboratory fees of $100, and suspended defendant's driving privileges in New Jersey for a period of two years.
On appeal, defendant argues:
POINT I THE TRIAL COURT ERRED IN REPLACING A JUROR WITH AN ALTERNATE.
POINT II THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE FOR A NEW TRIAL.
POINT III THE TRIAL COURT ERRED IN IMPOSING A SENTENCE IN EXCESS OF THE PRESUMPTIVE TERM.
We find that all issues raised by defendant are clearly without merit, R. 2:11-3(e)(2), except for defendant's argument about the trial court's excusal of a juror. Defendant argues that the excusal of a deliberating juror and her replacement with an alternate juror violated his right to a fair trial. Specifically, he contends that if, in fact, there was juror taint after deliberations began, the proper remedy was to declare a mistrial. He also contends that if the juror was untainted, it was impermissible to remove her on the grounds that her view was different from the rest of the jurors and that her removal came so late in the deliberations as to deprive the new juror of the benefit of full and complete deliberations with the other jurors.
Juror Linda Exum was chosen to sit as a deliberating juror. The trial court specifically and repeatedly instructed the jurors not to discuss the case with others. The jury began deliberations *397 on December 8, 1993, at 3:10 p.m. and continued until 4:00 p.m. After continuing its deliberations the next morning, the jurors advised the court that they had reached a unanimous verdict. The verdict as confirmed by the foreperson was guilty on all counts.
Defendant's attorney asked that the jury be polled. Upon doing so, the only juror who indicated it was not her verdict was Ms. Exum. The court specifically inquired of her whether she agreed with the verdict, and she replied, "I agreed so it could be over. But I did not really agree." The trial court then asked the jurors to continue their deliberations until they reached a unanimous verdict, also telling them that it was not satisfied that the verdict, as stated and after polling, was a unanimous verdict. The jurors then continued their deliberations. After the trial court inquired, counsel indicated that he asked for the poll because he had a feeling the jury did not "thoroughly understand the judge's direction on reasonable doubt." Other than that comment, neither defendant's attorney nor the prosecutor had any objection to the trial court's handling of the matter and its further instructions.
Thereafter, Ms. Exum advised the trial court judge that she wished to speak with him. Although somewhat reluctant to do so, the judge advised both counsel, who had no objection, of this request and indicated that he would speak to her on the record in their presence. Ms. Exum initially told the judge that she seemed to be the "hold-up" and "I feel one way and they feel the other." She felt that maybe she should change with one of the alternates. The court told her it would not be appropriate to excuse her and substitute one of the alternates for that reason. The trial court judge also told her that she should not change her mind just for the sake of reaching a verdict or agreeing with her fellow jurors; she had to decide in her own mind whether or not the State had proven beyond a reasonable doubt each and every element of the various offenses.
At that point, Ms. Exum advised the judge that there was one more thing she wanted to discuss with him. She said that she had gone to dinner with a relative who brought up a case involving *398 defendant's brother and who is "very close friends of these people and that helped me to decide but I had already made a decision." This relative allegedly did not know that Ms. Exum was a juror in defendant's trial. Upon further inquiry of Ms. Exum by the trial court, she confirmed that this relative had discussed a matter involving defendant's brother, not the instant matter, and that she had not discussed her conversation with the other members of the jury. When asked by the court whether her relative's comments affected her in any way with regard to this case, she responded, "Not really, but it helped, you know."
When the trial court inquired further whether the conversation changed her mind or changed the position she had taken, Ms. Exum responded in the negative. The trial court asked whether she felt that further discussion with the remaining jurors would be worthwhile and specifically asked her if she wanted to go back and deliberate further. She responded, "I don't think it's going to change my mind." Nonetheless, the trial court instructed her to go back and discuss the matter further with the other jurors, while admonishing her not to change her mind just for the sake of reaching a verdict. The trial court told her, however, that if the other jurors were able to convince her that she was wrong on the facts or on the evidence, there was nothing wrong with changing her mind; and there was nothing wrong with any of the other jurors changing their mind. Ms. Exum indicated that she understood.
At that point the prosecutor requested that the jury be asked to stop deliberating for a few minutes until the issues raised by the discussion with Ms. Exum were resolved. The trial court complied, indicating that Ms. Exum would be sent back in and the jury would be instructed to discontinue deliberations until specifically told to resume.
The prosecutor then argued that the situation now had a different complexion because the juror spoke of receiving outside information that impacted upon her decision, i.e., it convinced her of the correctness of her position. Clearly, that was an effect on *399 her attitude and deliberations that came from other than the evidence in the courtroom or from any witnesses. He argued that Ms. Exum made clear that this outside information affected her decision-making process, and the jury should be instructed not to deliberate further with the now-tainted juror; therefore, Ms. Exum should be removed. Since she had indicated that she had not said anything about what occurred to any of the other jurors, an alternate juror should be substituted and the jury should be instructed to start their deliberations anew.
Defendant's attorney responded by indicating that Ms. Exum had stated clearly that she had made her decision prior to the engagement with her relative who also happened to be a friend of defendant's family, and that she "ha[d] a perfect right to hold out on her conviction." Defendant's attorney then stated that he would "bow to whatever decision the judge makes." The trial court specifically inquired of defense counsel what his position was with regard to the question of whether Ms. Exum was tainted by matters outside the evidence. In posing that question, the trial court made reference to the fact that, although the conversation at issue involved defendant's brother, that conversation made her decision in this case easier. Thus, the trial court opined that it sounded to him like she was exposed to matters outside the evidence which potentially affected her position. Defendant's attorney responded that the other trial involving defendant's brother was not this trial and that Ms. Exum had said that she listened to the other person but made no comment.
The trial court then specifically commented that while defendant's brother's matter was not part of this case, a large part of defendant's defense was that the State "set up" defendant with these drug charges because they wanted to get information from defendant about his brother; therefore, the matters certainly were linked. Moreover, Ms. Exum indicated that there was a linkage in her mind when she indicated that the conversation about the other case made her decision in this case easier. The trial court then noted:

*400 It's quite well settled law that there are only two grounds that Courts look to, to determine whether there's been impropriety in the jury room. One is if there's matters involving racial, religious or bias of some sort that have entered into the juror's deliberation and the other is whether the jury or any member of the jury has been tainted by matters outside of the evidence being injected into the deliberation process and playing a roll [sic] in the decision. It seems to me that here we do have a very strong likelihood that these, this conversation with this one juror, did have some roll [sic] in her decision.
The trial court suggested that it might be appropriate to make further inquiry of Ms. Exum to ascertain more specifically what was said and what effect, if any, it had on her. Although the prosecutor opined that that was not really necessary, the trial court judge indicated that it would make his decision easier if he had this information. Therefore, Ms. Exum was brought back out for additional questioning.
In response to this questioning, Ms. Exum indicated that the conversation took place the previous night at dinner, and the person spoke to her about the case involving defendant's brother. This person allegedly did not know that Ms. Exum was on the jury in this case. After further conversations with Ms. Exum, the trial court judge asked her to be seated in a conference room while he discussed the situation with counsel.
Among the matters improperly transmitted to this juror were, first, that her relative said she knew defendant's family very well and that it was a good family. Second, Ms. Exum was told something to the effect that the police in the other case were "trying to get another brother involved" and she assumed that the brother referred to was the defendant on trial. The trial court opined that "[i]t certainly sounds to me now that we heard in a little more detail what was related, that this is material clearly outside of the evidence and it is clearly material that at least has a strong potential for affecting the juror."
Although the trial court also thought that it had heard the juror repeat again that she had already pretty much made up her mind before this conversation took place, the juror also acknowledged that her decision was made easier as a result of the comments made to her. Of course, that was somewhat belied by the fact *401 that Ms. Exum was quite equivocal. She apparently voted along with the rest of the jury one way but, when polled, indicated that she did not concur with the verdict. She also indicated that apparently she was not of the mind to find defendant guilty.
The prosecutor said that it was clear to him that Ms. Exum had to be excused from the jury for the reasons just expressed by the court. To allow her to continue, having had her decision-making process affected by information she received from a friend of defendant's family, would be improper, and the prosecutor urged that she had to be replaced by one of the alternates. Defendant's attorney responded, "[m]y objection stands for the removal of the juror, Your Honor, but again I have to bow to the ultimate decision of the Court."
After speaking with Ms. Exum, the trial court stated that it was satisfied that she had been tainted by her conversation the night before. The conversation occurred after jury deliberations had begun but before they were concluded. The trial court then again reviewed the substance of the conversation between Ms. Exum and her relative. Finally, the trial court stated that
I cannot but conclude that this juror having been exposed to those comments at this very sensitive stage in the midst of her deliberation was tainted by the material outside the evidence, outside the record and that requires me to take the extraordinary step to remove her from the jury.
The trial court then indicated its intention to substitute one of the alternate jurors and instruct the jury to begin their deliberations again. However, the trial court also wanted to briefly inquire once again of Ms. Exum to determine if she had discussed any of this with the other jurors. Ms. Exum was returned to the court room, and the trial court advised her that it was going to excuse her from further service on the jury. The trial court then specifically inquired of her whether she had discussed any of the conversation of the evening before with any other juror. The juror responded:
I told them that the reason, I told them that I really wouldn't feel  I wouldn't be fair because, if they feel that I should say he's guilty, because I don't feel that way. And I said I did have conversation with people, I did have a conversation with some *402 friends of mine that helped convince me and they really boost me up. So, it will be a waste of my time to stay in here. (Emphasis added.)
After excusing Ms. Exum, the trial court advised counsel that the jury would be brought out because the trial court wanted to assure itself and everyone else that the substance of any of those conversations was not communicated to the other jurors.
After the remaining jurors were brought out, the trial court advised them that it would be substituting one of the alternate jurors and that they should begin their deliberations again with that new juror. The trial court then inquired whether Ms. Exum had said anything to any of them about what someone else, not on the jury, said to her. The remaining eleven jurors, by a show of hands, satisfied the court that they had no knowledge of Ms. Exum's conversation with her relative. At that time an alternate juror was selected.
The trial court advised the jury that because of the change in the jury they were now a new jury, and that under the law they must disregard their past deliberations and begin the deliberations again. He advised them that in their new deliberations they were to eliminate any impact that Ms. Exum may have had and to consider the evidence in the context of the full and complete deliberations with the new member of the jury. With those instructions, the trial court asked them to return to the jury room and advise it when they had reached a verdict.
One juror then asked if they could take a vote as soon as they returned to the jury room. The court instructed them that they could deliberate in any manner they chose and that there were no restrictions whatsoever on their deliberations. They must, however, begin the deliberations again with the new member of the jury. The court advised them to remember that the new juror was not present during their initial discussions, although he did of course hear all the evidence and all of the court's instructions on the law.
The jury began deliberations anew at 12:10 p.m. on December 9, 1993. At that time, no objection was raised by either counsel. Later, the jury returned with a verdict of guilty on all counts. *403 After the jury was polled, the verdict was confirmed. No objection was raised by either counsel at that point in the proceedings.
On appeal, defendant argues in his brief that Superior Court Judge R. Benjamin Cohen erred in exercising his discretion by substituting an alternate juror.
Court rules govern the discharge and substitution of jurors, and specifically the dismissal of jurors after deliberations have begun:
If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.
[R. 1:8-2(d).]
See Pressler, Current N.J. Court Rules, comment 5 on R. 1:8-2(d) (1996).
This rule strikes a balance between the need for judicial economy and the right of defendants to a fair jury trial. State v. Valenzuela, 136 N.J. 458, 467, 643 A.2d 582 (1994). It permits jurors to be excused for compelling reasons related solely to their personal situation and not to their interaction with other jurors or with the case itself. Id. at 468, 643 A.2d 582. Juror substitution under such circumstances generally does not have the capacity to affect the substance or course of deliberations or impair a defendant's right to a fair and impartial jury trial. Ibid; State v. Trent, 157 N.J. Super. 231, 239, 384 A.2d 888 (App.Div. 1978), rev'd on other grounds, 79 N.J. 251, 398 A.2d 1271 (1979). The rule should be invoked only as a last resort to avoid a deplorable waste of time, effort and money inherent in ordering a mistrial. Invoking the rule and dismissing and replacing a deliberating juror is a matter of discretion for the trial court. State v. Valenzuela, supra, 136 N.J. at 468-70, 643 A.2d 582; State v. Miller, 76 N.J. 392, 406-07, 388 A.2d 218 (1978); State v. Lipsky, 164 N.J. Super. *404 39, 43, 395 A.2d 555 (App.Div. 1978); State v. Corsaro, 107 N.J. 339, 348, 526 A.2d 1046 (1987).
Our review of this record satisfies us that Judge Cohen reasonably exercised his discretion in dismissing Ms. Exum. Ms. Exum violated the often-repeated command that she not talk about the case with others. This conversation with her relative, together with her difficulty in the deliberative process, made her "unable to continue" within the context of R. 1:8-2(d). See State v. Miller, supra, 76 N.J. at 401, 406-07, 388 A.2d 218; State v. Trent, supra, 157 N.J. Super. at 240, 384 A.2d 888.
A juror who has once disregarded the court's unambiguous admonitions is just as likely do so in deciding the merits of the case as well. Moreover, her conversation with a relative patently influenced Ms. Exum to some degree, as she herself admitted. Judge Cohen reasonably concluded that Ms. Exum could not remain a deliberating juror because she was not able to continue as a fair and impartial juror, not because she appeared to be "pro-defendant." See State v. Reynolds, 124 N.J. 559, 567, 592 A.2d 194 (1991) (juror's demeanor can be as revealing as his or her words); State v. Singletary, 80 N.J. 55, 63, 402 A.2d 203 (1979) (determination of a juror's potential bias is subjective and dependent upon observation of the juror's demeanor).
Nothing in the record indicates that the discharge of this juror stemmed from any interaction in the jury room. Cf. State v. Valenzuela, supra, 136 N.J. at 471-73, 643 A.2d 582. Rather, her problem was personal and based on improper outside influences, and the record amply demonstrates that she was unable to properly deliberate and fulfill her function as a juror. Id. at 472-73, 643 A.2d 582.
We specifically reject as without merit defendant's suggestion that this court's holding in Trent  that the circumstances giving rise to dismissal cannot involve jury taint  precluded substitution here. Removal is appropriate where the record clearly *405 indicates that any taint has not infected the remaining jurors and no real or presumed harm has been done.
Furthermore, the timing of the juror substitution here did not require the trial court to grant a mistrial. Cf. State v. Valenzuela, 262 N.J. Super. 392, 400, 621 A.2d 63 (App.Div. 1993), aff'd on other grounds, 136 N.J. 458, 643 A.2d 582 (1994). Due to its specialized "feel" of the case, the trial court believed that the reconstituted jury was capable of fairly deliberating. Thus the reconstituted jury's ability to begin deliberations anew and the replacement juror's opportunity to fully express his views was not so affected by any progress that may have been made in prior deliberations, and defendant's fate was decided by twelve jurors who together deliberated to unanimity. See State v. Valenzuela, supra, 136 N.J. at 473-75, 643 A.2d 582; State v. Moore, 113 N.J. 239, 305, 550 A.2d 117 (1988); State v. Lipsky, supra, 164 N.J. Super. at 44-46, 395 A.2d 555. In fact, rather than cause a rift in deliberations, see State v. Corsaro, supra, 107 N.J. at 350-51, 526 A.2d 1046, alternate jurors are likely to function as effectively as if they had been present from the beginning and may also be able to reconcile solidifying and divergent positions of other jurors, Pressler, Current N.J. Court Rules, comment 5 on R. 1:8-2 (1996). This was not a case in which it was unwise to substitute a juror, and nothing in the record bespeaks of a jury which did not begin deliberations anew. See State v. Corsaro, supra, 107 N.J. at 351, 526 A.2d 1046 (citing State v. Miller, supra, 76 N.J. at 407, 388 A.2d 218).
We note that this was a relatively short trial. The fact that the new panel returned a verdict in an expeditious fashion does not in and of itself require a reversal of the conviction. The trial court correctly advised the jurors that they were free to commence their deliberations as they saw fit so long as it included the new juror. Even an initial jury considering this matter for the first time could have reasonably concluded with some dispatch the issue of guilt or innocence and called for a vote which they did after only a few hours of deliberation but the court could not *406 accept it because it was not unanimous.[3] We do not know if there were prior votes taken by the new panel.
We have no reason to conclude that the eleven remaining jurors failed to consider the evidence by full and complete deliberations with the new juror after specifically being instructed to "disregard your past deliberations, begin your deliberations again, just as if you were entering the juryroom for the first time." See State v. Corsaro, supra, 107 N.J. at 348, 526 A.2d 1046 (trial judge appropriately charged reconstituted jury to "start over") (quoting State v. Miller, supra, 76 N.J. at 407, 388 A.2d 218). This supplemental instruction was wholly appropriate, and the trial judge did not allow the remaining jurors to continue deliberations from the point of interruption. Cf. State v. Trent, supra, 79 N.J. at 257, 398 A.2d 1271. Juries are presumed to follow such instructions in the absence, as here, of evidence to the contrary. See State v. Coruzzi, 189 N.J. Super. 273, 301, 460 A.2d 120 (App.Div.), certif. denied, 94 N.J. 531, 468 A.2d 185 (1983); Fitzmaurice v. Van Vlaanderen Mach. Co., 110 N.J. Super. 159, 167, 264 A.2d 740 (App.Div. 1970), aff'd 57 N.J. 447, 273 A.2d 561 (1971).
The trial court did not abuse its discretion when it dismissed a deliberating juror and substituted an alternate juror in her place.
Affirmed.
NOTES
[1] Defendant was incorrectly designated as "Bismillah Holloway" in the indictment.
[2] Detective Nash indicated in his testimony that on September 2 when he went to the Munchie Shop to purchase drugs, he was unaware of defendant's identity.
[3] The jury deliberated approximately fifty minutes the first afternoon. The next morning, after the jury was polled on their original verdict and prior to the excusal of Ms. Exum, the prosecutor noted that the jury had "deliberated ... perhaps two hours this morning."