NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2118-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MICHELLE LODZINSKI,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

May 26, 2021

APPELLATE DIVISION

Argued April 1, 2019 – Decided August 7, 2019

Before Judges Messano, Fasciale and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-08-0871.

Gerald Krovatin and David W. Fassett argued the cause for appellant (Krovatin Klingeman, LLC and Arseneault & Fassett, LLP, attorneys; Gerald Krovatin, David W. Fassett, and Gregory D. Jones, on the briefs).

Joie D. Piderit, Assistant Prosecutor, argued the cause for respondent (Andrew C. Carey, Middlesex County Prosecutor, attorney; Joie D. Piderit, of counsel and on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

On May 25, 1991, defendant Michelle Lodzinski reported that her son, five-year-old Timothy (Timmy) Wiltsey, went missing while both were attending a Memorial Day carnival in Sayreville. Search efforts began immediately, they became widespread, and descriptions of Timmy, the clothing and Teenage Mutant Ninja Turtles (TMNT) sneakers he was wearing, and his continued disappearance received national media attention. In October 1991, a schoolteacher walking in the area of Olympic Drive, near the Raritan Center industrial complex in Edison, found a child's TMNT sneaker; believing it might be related to the case, he provided it to law enforcement authorities. Defendant had worked for a company in Raritan Center for approximately six months in the late 1980s.

Police were able to match the model number of the sneaker to a shoebox defendant provided shortly after Timmy's disappearance. When first shown the sneaker, defendant said it was not her son's, describing features that distinguished it from the sneakers Timmy was wearing. In November 1991, defendant returned to view the sneaker a second time and told authorities it could be her son's. She did not disclose, however, that she had worked in Raritan Center. Also in November 1991, police and an FBI agent assigned to

A-2118-16T2

the case searched the area on foot near where the sneaker was found, but they discovered nothing of significance.

FBI agent Ron Butkiewicz and police officers returned to the same general area on April 23, 1992, and the following day, April 24, and found a matching sneaker and a pillowcase. Approximately 150 yards away, and across Olympic Drive, they found Timmy's skeletal remains in the stagnant water of Red Root Creek, a tributary of the Raritan River. They also discovered remnants of his clothing, a shovel and a TMNT balloon, like Timmy sometimes kept in his bedroom at home.

Approximately twenty-five feet above the remains, embedded in the soil in the bank of the creek, Butkiewicz found a blue blanket with multi-colored, metallic fibers. Although FBI testing on the blanket revealed nothing of evidential value, years later, a New Jersey State Police forensic scientist identified metallic fibers found on the pillowcase as being similar to those in the blanket, although he never performed a full trace analysis. In 1992, defendant and her parents could not identify the blanket, but, twenty-years later, detectives showed the blanket to three women who babysat Timmy in the late 1980s and early 1990s; they identified it as coming from defendant's home. Police also showed the blanket to several other witnesses when the investigation was reopened, but none of them could identify it.

The medical examiner who examined the remains at the scene, but died before trial, could not reach a conclusion about the cause of Timmy's death. However, another medical examiner, Dr. Geetha Natajarian, who reviewed the autopsy reports, photographs, and investigative and other forensic reports, testified. She, too, could not determine a cause of death, but through a process of elimination, opined that the manner of Timmy's death was a homicide. A forensic anthropologist, Donna Fontana, opined that Timmy's body had decomposed where it was found, at a "surface burial" site.

Although defendant was immediately a suspect in the investigation of Timmy's disappearance, and remained so after the authorities found his remains, she never admitted having a role in either his disappearance or his death. Within the first two months after her son's disappearance, however, defendant provided numerous statements that conflicted with the account she first provided on the night of the carnival, i.e., that she went to purchase a soda and Timmy simply disappeared.

On June 6, 1991, defendant told authorities that two men abducted Timmy. The next day, she claimed that a woman she knew only as "Ellen" was at the carnival and offered to watch Timmy as defendant purchased her soda. Two men accompanied Ellen. Defendant described them, but did not know who they were. Initially, defendant claimed the trio just disappeared

with Timmy. In a later version, she said one of the men threatened her with a knife and told her not to say anything or they would harm Timmy.

Twenty-three years after Timmy's disappearance, a Middlesex County grand jury indicted defendant in a single count charging her with the first-degree murder of her son. Trial proceeded between March and May 2016. At the close of the State's case, defendant moved for a judgment of acquittal pursuant to Rule 3:18-1, which the judge denied. The jury found defendant guilty. After denying her motions for a judgment of acquittal notwithstanding the verdict (JNOV), Rule 3:18-2, or a new trial, Rule 3:20-1, the judge sentenced defendant to a thirty-year term of imprisonment with a thirty-year period of parole ineligibility.

Before us, defendant raises the following points:

> POINT I
>
> [DEFENDANT'S] CONVICTION SHOULD BE REVERSED, AND JUDGMENT OF ACQUITTAL SHOULD BE ENTERED, BECAUSE NO EVIDENCE SUGGESTED, MUCH LESS PROVED, THAT [DEFENDANT] CAUSED TIMOTHY'S DEATH.[1]
>
> POINT II
>
> [DEFENDANT'S] CONVICTION SHOULD BE VACATED AND A JUDGMENT OF ACQUITTAL

---

[1] We have omitted the sub-points of defendant's arguments.

A-2118-16T2

ENTERED BECAUSE THE STATE VIOLATED HER RIGHT TO DUE PROCESS OF LAW BY WAITING [TWENTY-THREE] YEARS TO SEEK HER INDICTMENT AND BRING HER TO TRIAL.

POINT III

THE TRIAL COURT COMMITTED ONE OR MORE REVERSIBLE ERRORS BY UNNECESSARILY AND IMPROPERLY INVOKING RULE 1:8-2(d)(1) TO REMOVE AND REPLACE A DEFENSE-LEANING JUROR WHO WAS ABLE TO CONTINUE DELIBERATING, WHEN DELIBERATIONS HAD ALREADY PROGRESSED TO AN ADVANCED STATE AND WITHOUT FINDING THAT THE RECONSTITUTED JURY WOULD BE IN A POSITION TO CONDUCT OPEN-MINDED AND FAIR DELIBERATIONS, THEREBY VIOLATING [DEFENDANT'S] RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY.

POINT IV

ALTERNATIVELY, THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO DECLARE A MISTRIAL UPON LEARNING THAT THE JURY HAD BEEN TAINTED BY OUTSIDE INFORMATION THAT HAD THE CAPACITY TO INFLUENCE THE RESULT.

We have considered these arguments in light of the record and applicable legal standards. We affirm.

I

Whether made before a verdict is returned, see Rule 3:18-1, or after, see Rule 3:18-2, the standard for deciding a motion for acquittal is the same. State v. Tindell, 417 N.J. Super. 530, 548-49 (App. Div. 2011).

> [T]he governing test is: whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. D.A., 191 N.J. 158, 163 (2007) (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).]

"The trial judge must consider only the existence of such evidence, not its 'worth, nature, or extent.'" State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

"It is generally stated that whether the motion to acquit is made at the end of the State's case or after the end of the entire case the standard is the same, i.e., only the State's proofs will be considered." State v. Sugar, 240 N.J. Super. 148, 152-53 (App. Div. 1990) (emphasis added) (citing Kluber, 130 N.J. Super. at 341-42). An exception to this general rule applies when "a defendant has had the benefit of the submission to the jury of a lesser[-]included offense based upon proofs adduced on his own case," and is convicted of that lesser-included offense. Id. at 153. In those circumstances,

"the sufficiency of the evidence should be tested upon a consideration of the entire record and not merely a limited application of the Reyes criteria to the State's proofs." Ibid.[2]

"The approach is the same though the testimony is circumstantial rather than direct; indeed in many situations circumstantial evidence may be 'more forceful and more persuasive than direct evidence.'" State v. Mayberry, 52 N.J. 413, 437 (1968) (quoting State v. Corby, 28 N.J. 106, 119 (1958)); accord Tindell, 417 N.J. Super. at 549. Even though the evidence must be sufficient to support a finding of guilt beyond a reasonable doubt, "[i]nferences need not be established beyond a reasonable doubt." Tindell, 417 N.J. Super. at 549 (citing State v. Taccetta, 301 N.J. Super. 227, 240 (App. Div. 1997)). As the Court has said:

> [A] jury may draw an inference from a fact whenever it is more probable than not that the inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference. Nevertheless, the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing

---

[2] Sugar is distinguishable, because although the jury in this case received instructions on the lesser-included offenses of aggravated manslaughter and reckless manslaughter, the evidence adduced on defendant's case amounted to a general denial of any involvement in Timmy's death, and defendant was convicted of murder and not either of the lesser-included offenses.

8

the essential elements of the offense charged beyond a reasonable doubt.

[State v. Brown, 80 N.J. 587, 592 (1979) (citations omitted).]

We apply the same legal standard as the trial judge and review the denial of a motion for acquittal de novo. State v. Fuqua, 234 N.J. 583, 590 (2018) (citing Sugar, 240 N.J. Super. at 153).

These principles, therefore, generally alleviate the necessity of describing in detail evidence defendant adduced at trial, which in this case was substantial and in many ways directly rebutted the State's proofs. For example, defendant produced several witnesses who claimed to have seen a young boy generally fitting Timmy's description at the carnival that night, thereby refuting the State's major contention that Timmy was never at the carnival with defendant, he was likely already dead at that point, and defendant concocted a story to escape detection. Defendant produced expert testimony that challenged the State's theory that defendant buried Timmy in a shallow grave where his remains were found, and criticized the handling of critical evidence, most notably the blanket. In addition, defendant produced witnesses that supported the defense of third-party guilt, i.e., that one or more persons abducted Timmy from the carnival.

In addition, we are not called upon to address the admissibility of the State's evidence, because none of the points on appeal raises such a challenge. Succinctly stated, the State contended that defendant killed Timmy, a child she bore out of wedlock at a very young age, because she was struggling financially and emotionally. It introduced evidence of Timmy's frequent absences and tardiness at school, that defendant sometimes brought him to her job sites because she could not find a babysitter and she moved from job to job, staying only a short period of time before leaving to find another. The State proved that defendant sometimes did not return from a night out, leaving the babysitter to fend for herself. It also introduced evidence of defendant's romantic involvement with a married man shortly after Timmy's disappearance and other "cavalier" conduct, including her behavior during various interviews with law enforcement and at Timmy's funeral.

Defendant objected to some of this evidence, and the trial judge astutely noted his concern on occasion regarding its admissibility. He noted, as do we, that the evidence frequently cut both ways. It suffices to say, whether a strategic decision or not, much of this evidence, which the State argued demonstrated motive, was admitted without objection and, in most instances was not subjected to analysis under the strictures of N.J.R.E. 404(b), and State v. Cofield, 127 N.J. 328, 338 (1992). See State v. Foglia, 415 N.J. Super. 106,

122-23 (App. Div. 2010) (noting that non-criminal "bad conduct evidence" still must undergo evaluation under the Rule and Cofield). Our comments are not intended as a criticism, but rather only to make clear that we address the argument raised in Point I on the record that exists, applying the standards already enunciated.

Due process requires that to convict any defendant, the State must prove all elements of a criminal charge beyond a reasonable doubt. State v. Kiriakakis, 235 N.J. 420, 431 (2018) (citing United States v. Booker, 543 U.S. 220, 230 (2005)). N.J.S.A. 2C:1-13(a) codifies this constitutional requirement and provides: "No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt. In the absence of such proof, the innocence of the defendant is assumed." To convict defendant of murder under N.J.S.A. 2C:11-3(a)(1) and (2), the State was required to prove beyond a reasonable doubt that she purposely or knowingly caused Timmy's death, or serious bodily injury that resulted in his death.

Our Criminal Code defines "purposely" and "knowingly" as follows:

> (1) Purposely. A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result.
>
> (2) Knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that

nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if <u>he is aware that it is practically certain that his conduct will cause such a result</u>. "Knowing," "with knowledge" or equivalent terms have the same meaning.

[N.J.S.A. 2C:2-2(b)(1) and (2) (emphases added).]

As can be seen, the requisite mental states supporting a conviction for murder require conduct by the actor and legal causation.

The Criminal Code also defines the relationship between conduct and causation:

a. Conduct is the cause of a result when:

(1) It is an antecedent but for which the result in question would not have occurred; and

. . . .

b. When the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, . . . of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

[N.J.S.A. 2C:2-3(a)(1) and (b).]

12

The Code "provides for a two-step analysis for determining the requisite causal connection. First, the finder of fact must determine whether the State has proven 'but-for' causation under subsection a. Second, it must consider the more specific requirement of . . . subsection[] b . . . ." Cannel, N.J. Criminal Code Annotated, cmt. 2 on N.J.S.A. 2C:2-3 (2019). The State establishes "but-for" causation "by demonstrating that the event[,]" here, Timmy's death, "would not have occurred absent . . . defendant's conduct." State v. Buckley, 216 N.J. 249, 263 (2013) (citing N.J.S.A. 2C:2-3(a)). [3]

Defendant's essential argument is that the State failed to prove she engaged in any conduct that caused Timmy's death. The State's arguments in response largely miss the mark.

For example, it is undisputed that in New Jersey, the State need not produce the victim's body, much less prove a specific cause of death. As we said in State v. Zarinsky, "[t]he failure to produce the victim's body does not preclude a finding that she is dead." 143 N.J. Super. 35, 54 (App. Div. 1976) (citing Commonwealth v. Burns, 187 A.2d 552, 558-59 (Pa. 1963)), aff'd, 75

---

[3] In this sense, the Code incorporates elements of the common law concept of corpus delicti. See State v. Hill, 47 N.J. 490, 496 (1966) ("It is clear that the corpus delicti is proved where the State . . . has produced facts and circumstances from which the jury can infer that a loss has occurred and that that loss was caused by or was a result of a criminal act.") (citing State v. Lucas, 30 N.J. 37, 53 (1959)).

N.J. 101 (1977).  "[T]he successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt."  Id. at 55 (citing Campbell v. People, 42 N.E. 123, 127 (Ill. 1895)).  That the prosecution need not produce the victim's body or, because of destruction or decomposition of the victim's remains, establish a cause of death, is widely accepted.  See, e.g., People v. Towler, 641 P.2d 1253, 1257-61 (Cal. 1982); Commonwealth v. Nadworny, 486 N.E.2d 675, 682-83 (Mass. 1985); Burns, 187 A.2d at 558-59; State v. Rebeterano, 681 P.2d 1265, 1267-68 (Utah 1984); Edwards v. Commonwealth, 808 S.E.2d 211, 216-20 (Va. Ct. App. 2017).

However, even though the victim's body was never found in Zarinsky, the State produced extensive direct and circumstantial evidence that showed the defendant engaged in some conduct that caused the victim's death. Witnesses identified the victim riding in the defendant's car shortly before she went missing; he was identified as the person who tried to lure two other young girls into his car two days earlier, and two others two weeks earlier; police found ammunition, as well as panties and hairclips similar to those worn by the victim, in the defendant's car, and blood on its rear bumper and taillight; and the defendant made incriminating admissions to jailmates.  143 N.J. Super.

at 41-47.  The contrast between such evidence of the defendant's <u>conduct</u> in <u>Zarinsky</u>, and what the State adduced here, requires no further comment.

Nor is it meaningful for the State to argue that a jury may convict a defendant solely on circumstantial evidence.  That proposition is beyond peradventure.  <u>See, e.g.</u>, <u>State v. Rogers</u>, 19 N.J. 218, 231-35 (1955); <u>State v. Donohue</u>, 2 N.J. 381, 389-92 (1949); <u>State v. Carroll</u>, 256 N.J. Super. 575, 603 (App. Div. 1992).

Rather, the issue here is whether the State proved, admittedly by circumstantial evidence, that defendant did "something to produce the prohibited . . . result[,]" Cannel, <u>N.J. Criminal Code Annotated</u>, cmt. 2 on N.J.S.A. 2C:2-3 (citing <u>State v. V.R.</u>, 387 N.J. Super. 342 (App. Div. 2006)), and "the actual result[,]" the death of her son, was "within [her] design or contemplation . . . or . . . involve[d] the same kind of injury or harm as that [she] designed or contemplated."  N.J.S.A. 2C:2-3(b).

We agree with the State that there was available proof for the jury to conclude beyond a reasonable doubt that Timmy's death was neither suicide nor an accident, but rather he was the victim of a homicide.  The jury was free to accept Dr. Natajarian's opinion in that regard.  It also could accept other circumstantial proof that the killing was not accidental.  Fontana's expert

opinion permitted an inference that whoever killed Timmy dug a shallow grave in a remote area to dispose of his body ostensibly to avoid detection.

There was also available evidence beyond a reasonable doubt that defendant placed Timmy's body in the shallow grave. She was the last person seen with him; defendant's landlady testified that she heard defendant and Timmy in the apartment on the morning of the carnival. Items recovered from the area where police found his remains, most significantly the blanket and the TMNT balloon, relate back directly to defendant's home. Defendant's conflicting, ever-changing statements made to law enforcement and others during the time Timmy was missing demonstrate an attempt to not only deflect suspicion from her, but to hinder the investigation.

After police found Timmy's sneaker and then his remains, defendant continued to obfuscate, first telling police the sneaker was not his, only to return later and tell police it could be. She said the blanket did not come from her home. Defendant failed to tell police that she had worked in the Raritan Center complex, and the jury was entitled to infer that her conduct after confirmation of Timmy's death was inconsistent with innocence and more consistent with a consciousness of her own guilt.

Nevertheless, defendant contends, without conceding, that despite proof she had the opportunity to commit the homicide and was present at and

participated in the burial of Timmy's remains, the State failed to adduce sufficient evidence that <u>she</u> engaged in conduct that caused his death, much less that she did so purposely or knowingly. Although this presents a close question, we disagree.

"Case law and treatises have recognized the special role of motive evidence and its unique capacity to provide a jury with an overarching narrative, permitting inferences for why a defendant might have engaged in the alleged criminal conduct." <u>State v. Calleia</u>, 206 N.J. 274, 293 (2011); <u>see also</u> Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 9 on N.J.R.E. 404 (2019) ("[M]otive evidence is that which discloses why the defendant committed a criminal offense.") (citing <u>State v. Hasher</u>, 246 N.J. Super. 495, 500 (Law Div. 1991)). "[C]ourts have admitted motive evidence even when it did no more than raise an inference of why a defendant may have engaged in criminal conduct . . . ." <u>Calleia</u>, 206 N.J. at 294.

The Court also has recognized that one purpose of motive evidence "is to aid the jury, particularly in a case resting upon circumstantial evidence, in determining <u>who the person was who committed the crime</u>." <u>State v. Carter</u>, 91 N.J. 86, 102 (1982) (emphasis added). "[M]otive evidence can 'establish <u>the identity of the defendant</u> as the person who committed the offense' and . . . 'is often of great importance, particularly in a case based largely on

circumstantial evidence.'"  Calleia, 206 N.J. at 293 (emphasis added) (quoting 1 Wharton on Criminal Evidence § 4:45, at 479 (15th ed. 1997)).  Here, the jury could accept the State's contention that defendant had sufficient motive to kill her son, who, despite evidence she introduced to the contrary, the State claimed was a burden to her.

Additionally, "a defendant's post-crime conduct evidencing a guilty conscience provide[s] a sound basis from which a jury logically could infer that a defendant was acting consistent with an admission of guilt or that the conduct was illuminating on a defendant's earlier state of mind."  State v. Williams, 190 N.J. 114, 126 (2007) (citing State v. Rechtschaffer, 70 N.J. 395, 413-15 (1976)).  Here, the State introduced evidence of defendant's conduct when she first reported Timmy was missing, and argued her false report of the events at the carnival, her ever-changing story of how Timmy disappeared, her omission of information that might have incriminated her, i.e., her prior employment at Raritan Center, and her unusual lack of emotion even after Timmy's remains were found, demonstrated her participation in criminal conduct that caused his death.  See, e.g., State v. Tucker, 190 N.J. 183, 190 (2007) (noting the State's ability "to impeach the validity of [a defendant's] statements" through "asserted inconsistencies . . . between two or more

statements"); State v. Cerce, 22 N.J. 236, 245-46 (1956) (evidence admitted as to the defendant's indifference when informed that his wife had been killed).

Additionally, to support a conviction for murder, the State was required to prove defendant's purposeful or knowing conduct. Evidence of only reckless conduct, underlying and supporting a conviction for aggravated manslaughter or reckless manslaughter, was insufficient. See N.J.S.A. 2C:11-4(a)(1) and (b)(1) (defining aggravated and reckless manslaughter); see also N.J.S.A. 2C:2-2(b)(3) ("A person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk that [a] material element[,]" in this case, death, "will result from his conduct."). The State, therefore, was entitled to disprove any reasonable doubt that defendant acted without the requisite intent. See N.J.R.E. 401 (evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence") (emphasis added). "The burden of establishing this connection is not onerous: 'if the evidence makes a desired inference more probable than it would be if the evidence were not admitted, then the required logical connection has been satisfied.'" State v. Garrison, 228 N.J. 182, 195 (2017) (quoting Williams, 190 N.J. at 123).

Circumstantial proof of intent, through defendant's words and conduct both before and after the crime, is well-recognized in our jurisprudence, and proof of intent is a specific exception to the general prohibition in N.J.R.E.

404(b) regarding evidence of other bad acts.  See N.J.R.E. 404(b) (prohibiting admission of evidence of "[o]ther crimes, wrongs, or acts[,]" generally, but allowing its admission "for other purposes, such as proof of . . . intent"). "Such evidence may be admissible . . . if it discloses the mental intention or purpose of a defendant in committing a criminal offense or to negate the existence of innocent intent."  Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 10 on N.J.R.E. 404 (emphasis added) (citing State v. Mulero, 51 N.J. 224, 228 (1968)).

Although "intent should not be 'confused' with motive[,]" there is a logical relationship between the two.  State v. Apprendi, 304 N.J. Super. 147, 157 (App. Div. 1997) (quoting Morss v. Forbes, 24 N.J. 341, 359 (1957)), aff'd, 159 N.J. 7 (1999), rev'd on other grounds sub nom. Apprendi v. New Jersey, 530 U.S. 466 (2000).  "In criminal law motive may be defined as . . . the moving power which impels to action for a definite result. . . . [I]ntent . . . is the purpose to use a particular means to effect a certain result."  Id. at 157-58 (quoting 21 Am. Jur. 2d Criminal Law § 173 (1981)).  Our courts have historically recognized a "wider range of evidence is permitted" to show both. Rogers, 19 N.J. at 228.

> Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist. . . . All evidentiary circumstances which are

20

relevant to or tend to shed light <u>on the motive or intent of the defendant or which tend fairly to explain his actions</u> are admissible in evidence against him . . . .

[<u>Ibid.</u> (emphasis added) (citations omitted).]

See also <u>State v. J.M., Jr.</u>, 438 N.J. Super. 215, 223 (App. Div. 2014) ("When offered as a means of proving intent, other-crimes evidence is often indistinguishable from motive."), <u>aff'd as modified</u>, 225 N.J. 146 (2016).

Post-crime consciousness of guilt evidence is relevant "to state of mind disputes" even when the crime charged requires reckless conduct. <u>Williams</u>, 190 N.J. at 129. Here, in addition to the evidence we have already discussed, the jury could conclude that defendant's contradictory statements about Timmy's disappearance were circumstantial evidence of a guilty state of mind regarding the cause of his death.

In <u>State v. Bzura</u>, the defendant, an attorney, was charged with theft of his client's money and false swearing based on subsequent inconsistent statements to the grand jury. 261 N.J. Super. 602, 606-07 (App. Div. 1993). In rejecting his argument that the charges should have been severed before trial, we held that the evidence of his false swearing would have been admissible even if the defendant were tried separately for theft. <u>Id.</u> at 616. "[T]he fact that [the] defendant made inconsistent statements . . . would tend to

show that [the] defendant acted with guilty intent when he obtained his client's money." Ibid. (citation omitted).

In sum, giving the State the benefit of all favorable testimony and reasonable inferences that could be drawn from that testimony, we conclude there was sufficient evidence to prove beyond a reasonable doubt that defendant purposefully or knowingly caused Timmy's death.

II

In her second point, defendant argues the judge erred in denying her motion to dismiss the indictment because of the twenty-three-year delay between the finding of Timmy's remains and the grand jury's action. She contends there was no reasonable explanation for failing to show Timmy's babysitters the blanket during the initial investigation, and the delay prejudiced her defense. She notes that although two defense witnesses who saw Timmy at the carnival testified at trial, one was unable to travel due to advanced age, testified by Skype and during her video testimony changed her account. A second had no recollection of the events, causing defendant to read the witness's contemporaneous statement to police for the jury.

"Statutes of limitations protect defendants from oppressive pre-indictment delay[,]" but New Jersey has no statute of limitations for prosecuting the crime of murder. State v. Townsend, 186 N.J. 473, 487 (2006)

(citing N.J.S.A. 2C:1-6(a)). Nevertheless, a due process violation may occur because of a delayed indictment if: (1) the State deliberately delayed indictment in order to gain a tactical advantage over the defendant; and (2) the delay caused the defendant actual prejudice in presenting his or her defense. Id. at 488-89 (citing United States v. Gouveia, 467 U.S. 180, 192 (1984)).

We agree with the trial judge that the record does not support a conclusion that the State deliberately delayed indictment in order to gain a tactical advantage over defendant. At most, the State's failure to show the blanket to more people in 1992, when investigators showed it only to defendant and her parents, evidences negligence. When the investigation was reopened in 2011, the State showed the blanket to a larger number of people, including not only Timmy's former babysitters, who identified it as belonging to defendant, but also to others who did not identify the blanket as defendant's. The jury heard the evidence on both sides, so we also discern no prejudice to defendant on this issue.

We further agree with the judge that defendant failed to demonstrate other prejudice occasioned by the delay. In addition to the two witnesses cited, defendant produced four other witnesses who identified a young boy of Timmy's general description who attended the carnival the night of May 25, 1991. Moreover, the delay allowed defendant to present a fuller third-party

defense, because a critical witness she produced at trial did not surface until 2015.

For these reasons, we reject the argument that pre-indictment delay violated defendant's due process rights.

III

We provide necessary context for defendant's remaining contentions. The jury began deliberations at approximately noon, Thursday, May 12, 2016. Late that afternoon, it requested playback of some testimony. The judge dismissed the jury for the day at 3:45 p.m., advising that playback would occur the following morning, which it did, lasting until 12:20 p.m. After lunch and further deliberations, the jury requested additional playback, which began at 2:52 p.m., but was not completed. The judge dismissed the jury at 3:56 p.m.

Playback continued on Monday morning, May 16, for approximately one hour, after which the jury returned to deliberate and requested more playback at 1:42 p.m. After some discussion with the attorneys, the judge told the jury to return to the jury room and clarify the request. Within minutes, at 1:53 p.m., the judge received a note: "Research was done by the foreman as to the FBI's protocol back in the 1990s."

In this regard, Agent Butkiewicz had testified that when he found the blanket near Timmy's remains in 1992, he never photographed it in situ, nor

did he measure its precise location from the skeletal remains or other landmarks at the scene. Butkiewicz claimed it was not FBI protocol at the time to do so. However, defense counsel vigorously cross-examined Butkiewicz about this and established through him and other State's witnesses that the lack of any procedure to document the exact location of the evidence was contrary to protocols established within New Jersey's law enforcement community.

Recognizing that a juror conducting independent research violated his repeated admonitions, the judge conferred with the attorneys and decided without objection to interview the juror. During questioning, the foreperson admitted that immediately before beginning deliberations he performed internet research on FBI protocols on his personal laptop computer at home. The juror said his research did not tell him "anything important" or "relevant" to the case, but he admitted speaking about his research with a few of the other jurors.

The judge then questioned the other deliberating jurors individually, and all stated they were aware of the foreperson's research. However, they each said the research and any conversations about it would not affect their consideration of the evidence. The judge dismissed the jury for the day.

On Tuesday, May 17, neither the State nor defendant moved for a mistrial. Defendant urged the judge not to remove the foreperson from the jury, and the State argued otherwise. The judge ruled that the foreperson should be removed pursuant to Rule 1:8-2(d), because he had proven himself unable and unwilling to follow the court's instructions. At this point, defendant claimed that deliberations had advanced to a point where substitution was improper, and defense counsel moved for a mistrial. Noting the jury had only deliberated for approximately five hours, the judge denied the motion.

The court selected an alternate juror, designated a new foreperson, and properly instructed the reconstituted jury to begin deliberations anew. After approximately an additional thirty minutes of the previously requested playback, the judge dismissed the jury for lunch. Some additional playback occurred upon its return, and the judge dismissed the jury after approximately ninety minutes of deliberations. The jury deliberated upon its return Wednesday morning, and, at 11:04 a.m., returned its verdict.

In a written supplemental opinion filed after the verdict but before consideration of defendant's formal post-verdict motions, the judge reasoned that dismissal of the foreperson was appropriate, because he was unable to follow the court's express, repeated instructions not to conduct independent

research and demonstrated a lack of candor in responding to the judge's questions. The judge determined that a mistrial was unwarranted because these issues were "personal" to the dismissed juror and did not affect the remaining jurors' ability to deliberate fairly.[4]

The judge entertained oral argument on defendant's post-verdict motions, and, in his written decision that accompanied the order denying JNOV or a new trial, the judge reiterated his prior reasoning. He concluded dismissal of the foreperson was proper under Rule 1:8-2(d)(1) and deliberations had not progressed so far that a mistrial was warranted.

In her third point, defendant argues that the judge erred by replacing the deliberating foreperson, and, in her fourth point, she alternatively contends that the judge should have declared a mistrial rather than replace the juror. The judge justified removing the deliberating foreperson pursuant to Rule 1:8-2(d)(1), which "provides that, after the jury begins its deliberations, an alternate juror may not be substituted unless 'a juror dies or is discharged by the court because of illness or other inability to continue.'" State v. Musa, 222

_____

[4] Defendant refers to the foreperson as a "defense-leaning" juror in her brief, but the juror's leanings are not apparent from the transcripts of the individual voir dire, as the judge carefully did not inquire about deliberations to that point. However, in his written supplemental decision, the judge parenthetically cited a post-verdict news article in which the substituted juror claimed to have been told by other jurors that the dismissed foreperson believed defendant was not guilty.

N.J. 554, 565 (2015) (quoting R. 1:8-2(d)(1)). The rule "is intended to strike a balance between a defendant's right to a fair trial decided by an impartial jury and judicial economy." Ibid. (citing State v. Jenkins, 182 N.J. 112, 124 (2004)).

The Court has construed the "'inability to continue' provision of th[e] rule[,] . . . restrictively . . . 'to protect a defendant's right to a fair jury trial.'" State v. Terrell, 231 N.J. 170, 171 (2017) (Albin, J., dissenting) (quoting Jenkins, 182 N.J. at 124). "[O]ur courts distinguish between reasons that are personal to the juror, which may permit a substitution under Rule 1:8-2(d)(1), and issues derived from 'the juror's interaction with the other jurors or with the case itself,' which may not." State v. Ross, 218 N.J. 130, 147 (2014) (quoting State v. Williams, 171 N.J. 151, 163 (2002)). "Our review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue' pursuant to Rule 1:8-2(d)(1), is deferential. We will not reverse a conviction unless the court has abused its discretion." Musa, 222 N.J. at 564-65 (citing Williams, 171 N.J. at 168, 170; State v Valenzuela, 136 N.J. 458, 473 (1994)).

Nevertheless, "there are times when jury deliberations have proceeded too far to permit replacement of a deliberating juror with an alternate." Jenkins, 182 N.J. at 131. While there is no set time after which substitution is

inappropriate, <u>Ross</u>, 218 N.J. at 151, "[t]hat critical threshold is passed when 'it is strongly inferable that the [remaining jurors have] made actual fact-findings or reached determinations of guilt or innocence [and] there is a concern that the new juror will not play a meaningful role in deliberations.'" <u>Musa</u>, 222 N.J. at 568 (second and third alterations in original) (quoting <u>Jenkins</u>, 182 N.J. at 132).[5] "Thus, a court must assess whether 'in light of the timing of the juror's dismissal and other relevant considerations . . . a reconstituted jury will be in a position to conduct open-minded and fair deliberations.'" <u>Ibid.</u> (quoting <u>Ross</u>, 218 N.J. at 147).

"The court must be prepared to declare a mistrial if a substitution would imperil the integrity of the jury's process." <u>Ross</u>, 218 N.J. at 147 (citing <u>State v. Hightower</u>, 146 N.J. 239, 253-54 (1996)). Our "review of 'a trial court's denial of a mistrial motion' is also governed by the abuse-of-discretion standard." <u>Musa</u>, 222 N.J. at 565 (quoting <u>State v. Yough</u>, 208 N.J. 385, 397 (2011)).

Defendant contends substitution was inappropriate because the circumstances justifying removal were "not exclusively personal to [the

---

[5] In <u>Ross</u>, the Court concluded the substitution of an alternate for an ill deliberating juror was permissible even though the jury had already "deliberated for a significant period" and indicated it was deadlocked. 218 N.J. at 152.

foreperson] and . . . affected the entire jury." She contends the Court's decision in <u>Hightower</u> "is directly on point and controls this case." We again disagree.

In <u>Hightower</u>, during deliberations in the penalty phase of a capital case, a juror performed outside research, learned that the victim had three children, and shared that information with other jurors. 146 N.J. at 248-50. While questioning the jurors on this issue, the court also inadvertently learned the jurors' positions on the merits of the case, and that the jury was at an advanced stage of deliberations having made tentative determinations with respect to the existence of all aggravating and mitigating factors. <u>Id.</u> at 249-50. The court chose to substitute the juror rather than declare a mistrial. <u>Id.</u> at 250-51. The reconstituted jury deliberated and returned a verdict of death. <u>Id.</u> at 251.

The Court reversed, finding error in the juror substitution because it occurred for reasons that were not exclusively personal to the juror. <u>Id.</u> at 255. The juror's "misconduct was related to the case and to his interactions with the other jurors." <u>Ibid.</u>

Nevertheless, the Court acknowledged "there might be some circumstances in which juror misconduct during jury deliberations might permit substitution of the offending juror." <u>Ibid.</u> In this regard, the Court distinguished our holding in <u>State v. Holloway</u>, 288 N.J. Super. 390 (App. Div.

1996), noting that in <u>Holloway</u>, although the juror substitution occurred due to juror misconduct and after extensive deliberations, there was no objection to the substitution, and the trial court found that the misconduct had not tainted the remaining jurors. <u>Hightower</u>, 146 N.J. at 256. Under the different facts presented, in <u>Hightower</u>, the Court concluded "the only option available" was declaring a mistrial. <u>Id.</u> at 255-56.

In <u>Holloway</u>, the jury reported reaching a verdict. 288 N.J. Super. at 397. When polled, however, one juror expressed disagreement with the verdict, so the judge ordered the jury to continue deliberations. <u>Ibid.</u> Thereafter, the objecting juror asked to speak with the court and told the judge she had dinner the night before with a relative, who talked about a case involving the defendant's brother, and indicated that he came from a good family. The juror said this conversation helped her make a decision, although she denied the conversation changed her mind. <u>Id.</u> at 397-98, 400-01. She had mentioned the conversation to the other jurors but had not discussed the substance of the conversation with them. <u>Id.</u> at 398, 401-02. When questioned by the court, the other jurors confirmed that they did not know the substance of the juror's conversation regarding the defendant's family. <u>Id.</u> at 402.

The prosecutor asked the judge to halt deliberations and remove the offending juror. <u>Id.</u> at 398-99, 401. The judge found the juror had been

31

tainted by outside information she received from her relative, id. at 401, substituted an alternate juror, and instructed the jury to begin deliberations anew. Id. at 399, 401-02. It returned a guilty verdict thereafter. Id. at 402.

We concluded the trial judge reasonably exercised his discretion in dismissing the juror, because the "conversation with her relative, together with her difficulty in the deliberative process, made her 'unable to continue' within the context of Rule 1:8-2(d)." Id. at 404. In language particularly relevant here, we said: "A juror who has once disregarded the court's unambiguous admonitions is just as likely do so in deciding the merits of the case as well." Ibid.

We also concluded that the juror's problem did not "stem[] from any interaction in the jury room." Ibid. Rather, it "was personal and based on improper outside influences, and the record amply demonstrate[d] that [the juror] was unable to properly deliberate and fulfill her function as a juror." Ibid. (citing State v. Valenzuela, 136 N.J. 458, 472-73 (1994)). In this regard, we said, "[r]emoval is appropriate where the record clearly indicates that any taint ha[d] not infected the remaining jurors and no real or presumed harm ha[d] been done." Id. at 404-05.[6]

---

[6] In Jenkins, 182 N.J. at 133 n.2, the Court disapproved of that part of our holding in Holloway that permitted substitution after the jury had announced

This case has factual similarities and differences to both Hightower and Holloway. Like Hightower, the foreperson here disclosed his outside research to the other jurors, whereas in Holloway, the offending juror never disclosed the substance of her conversations with her relative. But, unlike Hightower, where the "[j]uror misconduct . . . cause[d] a substantial likelihood that one or more jurors were impermissibly influenced" so as "to undermine the integrity of a death penalty trial[,]" 146 N.J. at 265, the judge here found, and the record supports his conclusion, that the foreperson's research produced no taint. The judge's voir dire of the other jurors confirms this.

Furthermore, while in both Hightower and Holloway, the jury's deliberations were advanced, here, the jury had been deliberating for only a short period of time. Also, unlike both of those cases, the jury here was still considering the evidence, as demonstrated by the playback of testimony that continued after the jury was reconstituted. See, e.g., Williams, 171 N.J. at 169-70 (finding no error in substitution after three hours of deliberations and while jury was requesting read-backs of testimony).

Under these particular circumstances, we cannot find the judge mistakenly exercised his discretion by removing the foreperson because of his

_____

its verdict. The Court found that substitution at that late juncture would not permit the reconstituted jury to truly deliberate anew.

inability to continue with deliberations in light of his forbidden internet research. We therefore also conclude that the judge did not err in denying defendant's mistrial motion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2118-16T2