**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1022-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILBER O. MEJIA-HERNANDEZ,
a/k/a WILBER O. MEJIA
HERNANDEZ, WILBER MEJIA
HERNANDEZ, WILBER
HERNANDEZ, and WILBER O.
HERNANDEZ,

    Defendant-Appellant.

_____

Submitted March 8, 2021 – Decided August 9, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 19-02-0189.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Following a jury trial, defendant was acquitted of attempted murder, but convicted of aggravated assault, weapons possession related offenses, and hindering apprehension or prosecution. He was sentenced to an aggregate term of fifteen years' imprisonment with a nine-and-one-half-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

The convictions stemmed from defendant's involvement in a shooting at a gentlemen's club. After defendant and two co-workers, codefendants Jose Taveras and Walter Siguencia, were ejected from the club due to an altercation with the staff, they plotted their revenge, switched vehicles, and retrieved a firearm from Taveras' home. They then returned to the club where Taveras fired the gun multiple times into the building, shooting one of the bouncers in the back. Thereafter, Taveras secreted the gun at their place of employment. Although defendant was not the actual shooter, he instigated the conflict at the club, suggested obtaining a gun, served as the driver of the getaway car after the shooting, and assisted in concealing the gun.

On appeal, defendant raises the following points for our consideration:

POINT ONE

JUROR SUBSTITUTION WAS NOT THE APPROPRIATE REMEDY WHERE THE EXTRANEOUS INFORMATION JUROR SEVEN CONVEYED TO MORE THAN HALF OF HER FELLOW JURORS HAD A TENDENCY TO INFLUENCE THE VERDICT INCONSISTENT WITH THE LEGAL PROOFS. (NOT RAISED BELOW).

POINT TWO

THE TRIAL JUDGE ERRED WHERE HE DID NOT DETERMINE WHETHER THE ALLEGED ACCOMPLICE'S STATEMENT IMPLICATING DEFENDANT IN THE CRIME WAS MADE UNDER CIRCUMSTANCES WHICH DEMONSTRATED THAT IT WAS SUFFICIENTLY RELIABLE TO BE USED AS SUBSTANTIVE EVIDENCE. (NOT RAISED BELOW).

POINT THREE

THE PROSECUTOR'S DECISION TO NOT SEEK A REDUCTION IN THE GRAVES ACT PENALTIES AS THEY APPLY TO DEFENDANT AMOUNTED TO A PATENT AND GROSS ABUSE OF DISCRETION.

POINT FOUR

THE TRIAL JUDGE'S DETERMINATION THAT THE PRISON TERMS IMPOSED ON THE TWO POSSESSORY CRIMES SHOULD EACH RUN CONSECUTIVE TO THE PRISON TERM IMPOSED ON THE AGGRAVATED ASSAULT CONVICTION WAS AN ABUSE OF DISCRETION.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm.

I.

On February 6, 2019, defendant and codefendants Taveras and Siguencia were charged in a superseding indictment[1] with first-degree attempted murder, N.J.S.A. 2C:5-1, 2C:11-3, and 2C:2-6 (count three); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) and 2C:2-6 (count four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) and 2C:2-6 (count five); two counts of second-degree possession of a firearm without a permit, N.J.S.A. 2C:39-5(b), and 2C:2-6 (counts six and seven); and third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1) and 2C:2-6 (count eight).[2]

During defendant's six-day trial that began on April 9, 2019, the State produced nine witnesses. In addition to several law enforcement witnesses,

---

[1] Defendant's pre-trial motion to dismiss the indictment on the ground of prosecutorial vindictiveness was denied by the trial judge.

[2] Of the nine counts contained in the indictment, prior to trial, counts two and nine were dismissed by the judge, and count one charged codefendant Taveras only.

the victim, his treating physician, a club manager, and codefendant Taveras[3] testified for the State. We glean these facts from the trial record.

On July 16, 2016, defendant along with codefendants Siguencia and Taveras went to the Players Club in South Hackensack after finishing work at J.J.'s Tires (J.J.'s). They drove there in Siguencia's car, a red Hyundai. While at the club, they drank and received "lap dance[s]" from the club dancers. At approximately 8:00 p.m., when a dispute arose over payment for a lap dance, all three defendants became embroiled in a physical altercation with the bouncers and the managers. The altercation, which lasted approximately "[fifteen] minutes," became violent after defendant "thr[e]w . . . money in the face of [one of the bouncers]." During the ensuing brawl, defendant hit one of the managers "with a bottle on the back of [his] head" and the bouncers "beat . . . up" defendant and Taveras. As a result, defendants were ejected from the club.

After leaving the club, all three defendants returned to J.J.'s where they discussed "going back [to the club] . . . [to] tak[e] revenge on [the bouncers]."

---

[3] During his testimony, Taveras acknowledged pleading guilty to aggravated assault and unlawful possession of a weapon in connection with the incident in exchange for a recommended maximum aggregate sentence of twelve years' imprisonment. Taveras also agreed to testify against his codefendants under the terms of his plea agreement.

In particular, "[defendant] wanted to go back" and "fight with them again." When defendant suggested going to New York to get his gun, Taveras stated that he had "something easier here in New Jersey." The three then left J.J.'s and proceeded to Taveras' residence in Paterson where Taveras retrieved a handgun.

From Taveras' residence, all three returned to the club armed with the gun. They drove in Taveras' "Volkswagen" and "parked on a corner" outside of the club. Upon arriving at the club, Siguencia, who had been the driver, and Taveras, who had been seated in the front passenger seat, exited the vehicle. At that point, defendant, who had been seated in the back, "took the wheel" and "wait[ed] at the corner" for his codefendants.

As they had discussed in the car, Taveras and Siguencia then proceeded to the "side of the club" where Taveras "got behind [some] cars." After Siguencia signaled that "security" was outside, Taveras fired several rounds into the front of the club, shattering the front window and hitting one of the bouncers. Taveras and Siguencia then returned to the Volkswagen where defendant was waiting, and defendant fled the scene, driving all three back to J.J's. Once inside the car, Taveras told defendant he had hit one of the bouncers.

A-1022-19

At J.J.'s, after discussing "what [they] were going to do," Taveras hid the gun "under the seat" of "another car that [he] had at the parking lot at [J.J.'s]." Thereafter, the three separated, each going "to their [respective] house." After two days, Taveras moved the gun and secreted it inside J.J.'s and informed defendant where he had hidden the gun. Taveras also disposed of the shell casings by throwing them in a river by J.J.'s.

One of the bouncers, Roy Rommeihs, who had exited the club at about 10:15 p.m. to take "a cigarette break," was struck in the back by one of the bullets. After Rommeihs was shot, he "managed to crawl" back into the club where he collapsed. Oscar Reyes, one of the club managers,[4] pulled Rommeihs to safety with the assistance of the patrons and staff, locked the doors, and called the police.

Responding officers rendered medical aid to Rommeihs until paramedics arrived and transported him by ambulance to the hospital, where he remained for "five or six days." After arriving at the hospital, Rommeihs was treated by Dr. George Kaptain, a neurosurgeon, for "[a] gunshot wound to the chest." The bullet had "entered through the back," travelled "through the chest cavity," and was "embed[ded] . . . within the thoracic vertebrae," about "an inch in

---

[4] Reyes was also the club's disc jockey.

A-1022-19

front of the spinal cord," and "about a half an inch away from the aorta." Rommeihs also suffered nerve damage and a "pneumothorax" or collapsed lung as a result of the gunshot injury. After evaluating Rommeihs' condition, Kaptain decided against surgery.

Detective James Donatello of the South Hackensack Police Department responded to the scene following the shooting and conducted the investigation. He gathered information from the victim, patrons and club employees, as well as video surveillance from a nearby business,[5] that captured "the entire shooting." From his investigation, Donatello learned about the earlier altercation at the club that led to the ejection of the three patrons. In conjunction with the Bergen County Sheriff's Office Bureau of Criminal Investigations, Donatello also identified bullet holes in the club and recovered bullet fragments in and around the club.

According to Donatello, the surveillance footage showed "the suspects arriv[ing at] the club," being "kicked out of the club after an altercation," returning to the club, and firing the shots. A total of "five" muzzle flashes were depicted in the footage. The footage also depicted "the victim falling and

---

[5] Although the club had security cameras, they were not working at the time of the incident.

crawling into the [club]." After viewing the video and speaking to the victim again, Donatello determined that the suspects had first arrived at the club in a red Hyundai. Through further investigation, the owner and operator of the vehicle was identified as Siguencia. As a result, Siguencia was arrested on July 19, 2016, three days after the shooting.

Thereafter, the investigation led Donatello to J.J.'s where Taveras and defendant were arrested on July 21, 2016, in connection with the shooting. After Taveras was arrested and interrogated, he was identified as the shooter with defendant acting as his accomplice. Once Taveras told police that the gun used in the shooting was secreted at J.J.'s, he was escorted back to J.J.'s where the gun was recovered. The gun, a .38 caliber revolver, was found "in an amplifier speaker box on the second floor of the building in a rack of tires." Subsequent investigation and ballistics testing confirmed that the handgun was operable and was the weapon used in the shooting. The gun was not registered in New Jersey and defendant did not have a permit to carry a gun in New Jersey.

Defendant did not testify at trial.[6] His motion for a judgment of acquittal at the close of the State's case was denied by the judge. See R. 3:18-1. The final charge to the jury included instructions on accomplice liability as well as conspiracy. The jury returned a verdict of guilty to third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) and 2C:2-6, as a lesser-included offense of count four; second-degree possession of a weapon for an unlawful purpose, a .38 caliber special revolver, as charged in count five; two counts of second-degree possession of a firearm without a permit, as charged in counts six and seven; and third-degree hindering apprehension or prosecution "by switching cars and parking away from the victim's place of employment on the night of the shooting and/or hiding the gun in an amplifier box," as charged in count eight. Defendant was acquitted of first-degree attempted murder, as charged in count three. Defendant was sentenced and a memorializing judgment of conviction was entered on August 29, 2019. This appeal followed.

II.

---

[6] Defendant produced one witness, Richard Gregory, a former detective in the Bergen County Prosecutor's Office, who testified about the results of a forensic analysis he conducted of all three defendants' cell phones. Gregory testified that Siguencia's and defendant's cell phones revealed web searches conducted between July 17 and 20, 2016, related to the shooting.

In Point One, defendant argues for the first time on appeal that a juror's "misconduct" in communicating "extraneous information" to other jurors so "infect[ed] the deliberation process" and "prejudiced defendant's right to a fair trial" that the judge's substitution of the juror with an alternate did not provide an adequate remedy. We disagree.

On April 18, 2019, the day after deliberations had begun, juror eleven approached a sheriff's officer and advised him that "he observed and/or heard another one of the jurors speaking to a sheriff's officer about the case." Juror eleven neither identified the juror nor the officer. Upon questioning by the judge, juror eleven stated that he overheard "[a]nother juror . . . sa[y] that she talked to somebody she knew in law enforcement about the bullet pattern on the front of the club." Juror eleven identified the juror in question as juror seven. After instructing juror eleven to not disclose their discussion to the other jurors, the judge questioned juror seven.

Juror seven denied speaking to anybody about any evidence in the case. After the judge instructed juror seven not to disclose their discussion, he recalled juror eleven to clarify what he had heard. Juror eleven then elaborated that when he first arrived that morning, juror seven told all the jurors who had gathered in the jury room that "she had spoken to somebody

she knew in law enforcement about . . . [whether] the bullet pattern made any sense." Juror eleven specified that "most" of the jurors were present at the time. In response to the judge's inquiry, juror eleven explicitly assured the judge that he could still be fair and impartial and consider the case based solely upon the evidence presented at trial, notwithstanding what was said by juror seven.

Based on juror eleven's responses, the judge interviewed all the remaining deliberating jurors individually in counsels' presence. Four jurors, jurors two, three, eight, and fourteen, told the judge they did not hear anything. On the other hand, six jurors, jurors four, five, six, ten, twelve, and thirteen, reported hearing juror seven make various comments about discussing the case with someone other than her fellow jurors. Jurors ten, twelve, and thirteen heard juror seven say she spoke to someone[7] but did not hear or recall any specifics. Juror four heard juror seven say she asked "an officer" "a question about guns and bullets." Juror five heard juror seven say she spoke "to a friend regarding the shots," and juror six heard juror seven say she asked "an officer" about "how to rule on a certain aspect of the case."

---

[7] Juror twelve specified that juror seven said she spoke to a "police officer."

All ten jurors assured the judge that they would not be affected by juror seven's comments and that they could be "fair and impartial" and "judge th[e] case solely upon the evidence [presented] in th[e] courtroom." As a result, the judge determined that there was "no reason to declare a mistrial." However, the judge found that "there [was] a basis to excuse [juror seven] and substitute . . . [the] alternate . . . and have the jurors begin their deliberations anew." As a result, despite her denials, the judge excused juror seven for failing to "follow[ his] instructions regarding discussing th[e] matter with anyone other than [her] fellow jurors," substituted the alternate, juror nine, and gave the jury the pertinent instructions. See Model Jury Charges (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (rev. Mar. 14, 2016).

In that regard, the judge specifically instructed the newly constituted jury that although the reason juror seven was excused "was entirely personal to her," they were not to "speculate on the reason why [juror seven] was excused" and they were to "give no weight to any opinion expressed by [juror seven] during deliberations." The judge also directed the jurors to "start . . . deliberations over again" as they were "a new jury." After deliberating for several more hours, the jury returned a verdict.

13

At no point did defense counsel object to the judge's actions, ruling, or instructions. Because defendant failed to object at trial, we review for plain error. "That standard requires that we determine whether the error asserted 'is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Cuff, 239 N.J. 321, 340 (2019) (quoting R. 2:10-2).

The legal principles that guide our analysis of this issue are well settled. "The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants" the right to an impartial jury during trial. State v. R.D., 169 N.J. 551, 557 (2001). Criminal defendants are "entitled to a jury that is free of outside influences and [that] will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." State v. Williams, 93 N.J. 39, 60 (1983). "The securing and preservation of an impartial jury goes to the very essence of a fair trial." Ibid. "[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

14

However, a juror's exposure to outside influences does not necessarily mean that there must be a new trial, because it would be nearly impossible to guard against any and all outside influences that could potentially affect a juror's vote.  Id. at 559.

> Ultimately, the trial court is in the best position to determine whether the jury has been tainted.  That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.
>
> [Ibid.]

"Where the court concludes there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of [the] jury, it should conduct a voir dire to determine whether any exposure has occurred." Bey, 112 N.J. at 86.

> If there is any indication of such exposure or knowledge of extra-judicial information, the court should question those jurors individually in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.
>
> [Id. at 86-87.]

"The abuse of discretion standard of review should pertain when reviewing such determinations of a trial court." R.D., 169 N.J. at 559.

Rule 1:8-2(d)(1) allows the substitution of a juror with an alternate juror after the commencement of deliberations "in specifically defined circumstances." State v. Jenkins, 182 N.J. 112, 123-24 (2004). "Rule 1:8-2(d)(1) and our case law delineate the circumstances in which juror substitution will not undermine the sanctity of the jury's deliberative process." Id. at 124. One such circumstance allows the substitution of a juror with an alternate because of the substituted juror's "inability to continue." R. 1:8-2(d)(1). "[T]he 'inability to continue' standard is necessarily vague because it is impossible to catalogue the myriad circumstances personal to a deliberating juror that may warrant her removal and substitution." Jenkins, 182 N.J. at 124.

"[B]ecause 'juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process,'" a "deliberating juror may not be discharged and replaced with an alternate unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'" Id. at 124-26 (alteration in original) (quoting State v. Hightower, 146 N.J. 239, 254 (1996)); see State v. Valenzuela, 136 N.J. 458, 468 (1994) ("The 'unable to

16

continue' language . . . [applies] to compelling circumstances which are exclusively personal to the juror in question, and . . . which by their nature cannot raise the specter of either a jury taint or substantive interference with the ultimate course of the deliberations." (citation omitted)).  "Our review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to Rule 1:8-2(d)(1), is deferential."  State v. Musa, 222 N.J. 554, 564-65 (2015).  "We will not reverse a conviction unless the court has abused its discretion."  Id. at 565.

"Courts have sanctioned the removal and replacement of deliberating jurors under the 'inability to continue' standard in a variety of different circumstances."  Jenkins, 182 N.J. at 125.  Pertinent to this appeal, in State v. Holloway, we affirmed the removal of a deliberating juror whose "conversation with a relative patently influenced [her]" and who, as such, "disregarded the court's unambiguous admonitions . . . ."  288 N.J. Super. 390, 404 (App. Div. 1996).  We determined that the juror's "conversation with her relative, together with her difficulty in the deliberative process, made her 'unable to continue' within the context of [Rule] 1:8-2(d)."  Ibid.  We found that "her problem was personal and based on improper outside influences," and noted that "[a] juror who has once disregarded the court's unambiguous

admonitions is just as likely do so in deciding the merits of the case as well." Ibid.

While the Jenkins Court overruled Holloway in part because the substitute juror was "allowed . . . to join a jury that had announced its verdict to convict," 182 N.J. at 133 n.2, the removal of the deliberating juror pursuant to Rule 1:8-2(d) was not questioned. Instead, the Jenkins Court concluded that "the timing of the juror substitution" was problematic because an alternate juror would surely "fac[e] closed minds . . . ." Ibid. According to the Court, under those circumstances, a mistrial should have been declared. Ibid.

Here, we are satisfied that the judge's actions were entirely proper. The record amply demonstrates that juror seven was unable to properly deliberate and fulfill her function as a juror. In fact, she suffered from an inability to function that was personal and unrelated to her interaction with the other jurors. Thus, the judge was well within his discretion to make the juror substitution under Rule 1:8-2(d)(1). As in Holloway, having "once disregarded the court's unambiguous admonitions," it was "just as likely" that she would continue to "do so in deciding the merits of the case as well." Ibid.

Further, we discern no abuse of discretion in the judge's assessment based on the jurors' demeanor that there was no juror taint. The judge's

18

questioning of the deliberating jurors was carefully crafted and tailored to elicit answers that bore on their ability to be fair and impartial in light of juror seven's comments and to judge the case based solely on the evidence presented in the courtroom. See Musa, 222 N.J. at 572 ("Questioning, if not properly narrowed, had the potential to impermissibly infringe on the jury's deliberative process."). The judge expressly found that each juror "was unequivocal" that juror seven's comments did not affect "their ability to be fair and impartial or their ability to judge the evidence in th[e] case." Contrary to defendant's assertion, the judge's implicit finding that the extraneous information conveyed by juror seven had no tendency to influence the verdict inconsistent with the proofs adduced at trial was supported by the fact that juror seven's comments merely posed questions, not answers.

Likewise, we find no fault with the judge's decision to substitute the alternate and continue deliberations with a newly constituted jury. In making that decision, the trial court must consider the impact the juror's substitution will have "on the jury process." State v. Ross, 218 N.J. 130, 147 (2014). If a substitution of a juror would "imperil the integrity of the jury's process . . . [t]he court must be prepared to declare a mistrial." Ibid. However, granting a mistrial in these circumstances is "an extraordinary remedy to be exercised

19

only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

Here, under the circumstances, the judge was not required to declare a mistrial and, given the timing of the substitution, the judge properly concluded that "a reconstituted jury [would] be in a position to conduct open-minded and fair deliberations." Ross, 218 N.J. at 147; see Musa, 222 N.J. at 572 (explaining that because "[t]he jurors had deliberated for only one afternoon" and "had not reached a decision," the deliberations "had not proceeded to a point where juror substitution was not allowed"). In fact, based on the timing of the substitution, there was no "fear . . . of an alternate juror facing closed minds . . . ." Jenkins, 182 N.J. at 133 n.2. The judge also correctly charged the newly constituted jury in accordance with Ross. The Ross Court directed trial courts to "charge the jury that the excused juror's departure was prompted by personal issues, . . . that the reconstituted jury should not speculate on the reasons for the juror's departure, and that the jury should begin deliberations anew . . . ." 218 N.J. at 151; see also R. 1:8-2(d)(1) (stating that "the court shall instruct the jury to recommence deliberations" when the court excuses a

20

juror after deliberations have begun and substitutes an alternate juror). In sum, we find no error, much less plain error.

## III.

In Point Two, defendant argues that "[n]otwithstanding [his] failure to object" at trial, his convictions should be reversed because the State's case "turns exclusively" on the testimony of "an unreliable witness," namely, "Taveras, an alleged accomplice." Defendant asserts the judge erred in failing to conduct a N.J.R.E. 104(a) hearing to determine whether the statements Taveras attributed to defendant to establish "the plot for revenge" were admissible. Defendant continues that "[b]ecause Taveras' trial testimony was the only evidence describing defendant's role in the plot, its prejudice is glaring."

"Under N.J.R.E. 803(b)(5), a statement is not excluded by the hearsay rule if it was 'made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and . . . made in furtherance of that plan.'" State v. Cagno, 211 N.J. 488, 529-30 (2012) (quoting N.J.R.E. 803(b)(5)). Pursuant to State v. Phelps, co-conspirator statements under this exception are not admissible at trial unless: (1) the statement was made "in furtherance of the conspiracy"; (2) the statement was made "during the course

of the conspiracy"; and (3) aside from the hearsay statement at issue, there is independent evidence showing "the existence of the conspiracy and defendant's involvement to it."  96 N.J. 500, 509-10 (1984).  "The independent evidence may take many forms" and "may be direct or circumstantial" as long as it is "substantial enough to engender a strong belief in the existence of the conspiracy and of defendant's participation."  Id. at 511.

"A conspiracy continues until its objective is fulfilled."  State v. Savage, 172 N.J. 374, 403 (2002).  "However, a conspiracy may continue beyond the actual commission of the object of the conspiracy if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled in order to avoid apprehension."  Ibid.  "Moreover, statements relating to past events may be admissible if they are 'in furtherance' of the conspiracy and 'serve some current purpose, such as to provide cohesiveness, provide reassurances to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy.'"  Ibid. (quoting State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997)).

"Participation in a conspiracy confers upon co-conspirators the authority to act in one another's behalf to achieve the goals of the unlawful scheme. Since conspirators are substantively liable for the acts of their co-conspirators,

they are equally responsible for statements by their confederates to further the unlawful plan." State v. Harris, 298 N.J. Super. 478, 487 (App. Div. 1997). "The exception has long been recognized and upheld, notwithstanding that the opportunity to cross-examine is denied" because "[t]he circumstances afford a sufficient guarantee of testimonial trustworthiness." Ibid.

Although the admissibility of statements made by a co-conspirator should generally be determined at a Rule 104(a) hearing outside the presence of the jury, "[n]o problem arises when the prosecution satisfies the conditions precedent before the hearsay statement is admitted." Phelps, 96 N.J. at 519-20. Indeed, "our concern is with the kind of evidence necessary to satisfy the rule and whether this was actually furnished." State v. McKiver, 199 N.J. Super. 542, 546 (App. Div. 1985). "The least degree of concert of action suffices to render the act of one conspirator the act of all." Ibid. (quoting State v. Carbone, 10 N.J. 329, 340 (1952)).

Here, we are satisfied that a Rule 104(a) hearing was not necessary because the State satisfied the three-prong Phelps test before the hearsay was elicited. Before codefendant Taveras testified, Detective Donatello detailed his investigation leading to the identification and apprehension of all three defendants as participants in the crimes. Thus, aside from the hearsay

statements at issue, the State provided ample independent evidence of the conspiracy that was substantial enough to engender a strong belief in the existence of the conspiracy and defendant's participation in it. Moreover, the statements Taveras attributed to defendant were clearly made in furtherance and in the course of the conspiracy. Under these circumstances, we conclude that the <u>Phelps</u> criteria were fully satisfied and we discern no plain error.[8] <u>See</u> <u>R.</u> 2:10-2 (requiring that we disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result").

IV.

In Point Three, defendant argues that "the prosecutor's decision to not seek a reduction in the Graves Act penalties as they apply to [him] amounts to a patent and gross abuse of discretion" and the judge erred in rejecting his request for relief. We disagree.

The Graves Act requires a mandatory term of imprisonment for individuals convicted of various firearm-related crimes. N.J.S.A. 2C:43-6(c). The Act specifically requires that "[t]he term of imprisonment shall include the

---

[8] To the extent defendant's argument challenges the assessment of Taveras' credibility, rather than the admissibility of his testimony, the issue of credibility is for the jury which was apprised of the factors pertinent to assessing credibility, including Taveras' plea agreement with the State.

imposition of a minimum term" which "shall be fixed at one-half of the sentence imposed by the court or [forty-two] months, whichever is greater. . . ." Ibid. The Graves Act, however, contains an "'escape valve' to the mandatory sentence requirements . . . ." State v. Alvarez, 246 N.J. Super. 137, 139 (App. Div. 1991).

This "escape valve" provides:

> On a motion by the prosecutor made to the [A]ssignment [J]udge that the imposition of a mandatory minimum term of imprisonment under [the Graves Act] for a defendant who has not previously been convicted of an offense under [the Graves Act], . . . does not serve the interests of justice, the [A]ssignment [J]udge shall place the defendant on probation . . . or reduce to one year the mandatory minimum term of imprisonment during which the defendant will be ineligible for parole. The sentencing court may also refer a case of a defendant who has not previously been convicted of an offense under that subsection to the [A]ssignment [J]udge, with the approval of the prosecutor, if the sentencing court believes that the interests of justice would not be served by the imposition of a mandatory minimum term.
>
> [N.J.S.A. 2C:43-6.2.]

"[W]ritten guidelines exist to channel prosecutorial discretion" in evaluating waiver applications. State v. Benjamin, 228 N.J. 358, 372 (2017). The guidelines, outlined in the Attorney General Directive to Ensure Uniform

25

Enforcement of the "Graves Act" (Oct. 23, 2008, as corrected Nov. 25, 2008) (Directive), instruct prosecutors "contemplating a waiver to 'consider all relevant circumstances concerning the offense conduct and the offender,' such as applicable aggravating and mitigating circumstances under N.J.S.A. 2C:44-1 . . . ." Benjamin, 228 N.J. at 369. Should the prosecutor decide not to approve the waiver, a defendant may move "before the [A]ssignment [J]udge or designated judge . . . for a . . . hearing as to whether the prosecutor's rejection or refusal is grossly arbitrary or capricious or a patent abuse of discretion." Alvarez, 246 N.J. Super. at 147 (quoting State v. Cengiz, 241 N.J. Super. 482, 497-98 (App. Div. 1990)). A defendant "must make a showing of arbitrariness constituting an unconstitutional discrimination or denial of equal protection constituting a 'manifest injustice,'" and the Assignment Judge must determine if a hearing is warranted "in the interests of justice." Id. at 148-49 (citation and internal quotation marks omitted).

The interest of justice standard requires the court to consider whether "the sentence reflect[s] the Legislature's intention" because "the severity of the crime [is] the most single important factor in the sentencing process." State v. Megargel, 143 N.J. 484, 500 (1996). The court "must consider the nature of and the relevant circumstances pertaining to the offense," including "facts

personal to the defendant" such as the "defendant's role in the incident to determine the need to deter him from further crimes and the corresponding need to protect the public from him." Id. at 500-01. The judge must identify "any reasons, compelling or otherwise," as to why the interest of justice standard applies. Id. at 503. In that regard, "courts must 'view the prosecutor's decision through the filter of the highly deferential standard of review.'" State v. Waters, 439 N.J. Super. 215, 237-38 (App. Div. 2015) (quoting State v. Wallace, 146 N.J. 576, 589 (1996)).

Here, after the jury returned its verdict convicting defendant of four offenses that subjected him to the Graves Act,[9] defendant filed an application for a waiver of the mandatory minimum sentence under the Graves Act.[10] In a June 4, 2019 letter, the State detailed its reasons "for refusing to consent to the Graves Act waiver." On June 21, 2019, following a hearing, the Criminal Presiding Judge designated to hear waiver applications denied defendant's request for a waiver. In a detailed written opinion accompanying the order, the judge recounted the applicable legal principles and standard of review, noting

---

[9] With the exception of the hindering charge, all the offenses of which defendant was convicted were Graves Act eligible offenses.

[10] A pre-trial application seeking the State's consent for a Graves Act waiver was denied.

that "the question is not merely whether the interests of justice weigh in favor of a waiver, but whether the prosecutor committed a patent or gross abuse of discretion in determining that the interest of justice did not weigh in favor of a waiver."  The judge concluded defendant failed to carry his heavy burden to establish a patent and gross abuse of discretion on the part of the prosecutor.

In expressly rejecting defendant's contention that the prosecutor abused her discretion, the judge pointed out that the prosecutor adhered to "the Attorney General Guidelines for waiving the Graves Act," and "analyzed all of the pertinent mitigating and aggravating factors set forth in N.J.S.A. 2C:44-1, including [d]efendant's lack of a prior criminal record."[11]  The judge found that

> [t]he prosecutor's cited considerations were based on competent, reasonably credible evidence that would naturally be a part of an assessment of [d]efendant's risk of recidivism and the need to deter [d]efendant and others from committing similar criminal offenses. These considerations, the court finds, were appropriate for the prosecutor to consider in light of the purposes of sentencing within the context of the Graves Act.

---

[11]  Specifically, the prosecutor found aggravating factors three and nine.  See N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that . . . defendant will commit another offense"); N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring . . . defendant and others from violating the law").  Further, the prosecutor postulated that even if mitigating factors seven and eleven applied, they should not carry much weight.  See N.J.S.A. 2C:44-1(b)(7) ("[t]he defendant has no history of prior delinquency or criminal activity"); N.J.S.A. 2C:44-1(b)(11) ("[t]he imprisonment of the defendant would entail excessive hardship to . . . the defendant's dependents").

The judge acknowledged that "some accomplices [are] deserving of leniency from the Graves Act." However, according to the judge, the prosecutor provided detailed reasons why "[d]efendant's status as an accomplice/co-conspirator" did not warrant such leniency. Specifically, "[t]he facts clearly show[ed] that [d]efendant shared Taveras' purpose when Taveras retrieved, possessed, and used the firearm, i.e., to take revenge and purposely or knowingly cause bodily injury to Rommiehs with a deadly weapon." See State v. Jefimowicz, 119 N.J. 152, 157-58 (1990) ("[A]ccomplices found guilty of Graves Act offenses . . . who knew or had reason to know that their compatriots would use or be in possession of a firearm, are subject to Graves Act penalties." (citing State v. White, 98 N.J. 122, 126 (1984))).

The judge further explained:

> In undertaking an independent assessment of the relevant factors in this case, the court is unable to find that the prosecutor committed a clear error in judgment in denying the Graves Act [w]aiver. While [d]efendant may not have travelled initially to [the] Player's Club with intent to commit any crimes, it is clear that [d]efendant thereafter acted deliberately and purposely in triggering a series of events that lead to the shooting of Rommiehs. The facts presented to the court demonstrate that [d]efendant instigated a conflict with staff at the Player's Club. Defendant then escalated the conflict by suggesting that the defendants retrieve a firearm from his home and return

29

to [the] Player's Club, which then led to Taveras offering to use his firearm for this purpose. Defendant played a crucial role in the eventual shooting, acting as a getaway driver and later assisting in the concealment of the weapon at [d]efendant's and Taveras' place of employment. While it is true that [d]efendant was only an accomplice and otherwise had no prior criminal record, this case presents far different facts from those where a weapon was possessed with an unlawful purpose but did not actually result in harm to another.

The judge concluded that defendant's "demonstrated behavior" was "a far cry from the accidental or aberrational use and possession of firearms that do not deserve the stringent sentencing provisions of the Graves Act" but rather fell "within the heartland of the Graves Act." We agree with the judge's cogent and well-reasoned written opinion and reject defendant's unpersuasive and baseless arguments that the judge applied the wrong standard of review or erred in concluding that defendant's conduct fell "within the heartland of the Graves Act."

V.

In Point Four, defendant argues that the sentencing judge abused his discretion in determining "that counts six and seven should each run consecutively to counts four and five." We disagree.

30

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and acknowledge that we "should not 'substitute [our] judgment for those of our sentencing courts.'" Cuff, 239 N.J. at 347 (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Certain considerations govern a trial court's decision to impose consecutive sentences, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims; [and]
>
> (e) the convictions for which the sentences are to be imposed are numerous.

31

[State v. Molina, 168 N.J. 436, 441-42 (2001) (quoting State v. Yarbough, 100 N.J. 627, 644 (1985)).]

Here, defendant does not challenge the judge's finding of aggravating and mitigating factors, [12] only the imposition of consecutive sentences. Following appropriate merger, the judge imposed a ten-year sentence of imprisonment with a five-year period of parole ineligibility on count five; a five-year term with a forty-two-month period of parole ineligibility each on counts six and seven, to run concurrent with each other but consecutive to count five; and a concurrent four-year term of imprisonment on count eight.

Guided by the Yarbough criteria, the judge explained his rationale for imposing consecutive sentences, stating that the unlawful possession of a firearm offenses charged in counts six and seven were "separate" and "distinct offense[s] from possession of a firearm for an unlawful purpose" charged in count five. The judge pointed out that the crimes were separate and distinct statutes passed by the Legislature with different objectives that were predominantly independent of each other. Additionally, according to the judge, while overlapping, the time periods and locations of the offenses were

---

[12] The judge found aggravating factors two, three and nine, see N.J.S.A. 2C:44-1(a)(2) ("[t]he gravity and seriousness of harm inflicted on the victim"), and mitigating factors seven and eleven. The judge determined that the aggravating factors outweighed the mitigating factors.

different. Count seven encompassed July 16 to 21, 2016, reflecting defendant's and Taveras' continued possession of the firearm between the shooting at the Player's Club and their apprehension at J.J.'s, while counts five and six occurred on July 16, the date of the shooting.

We are satisfied that the imposition of consecutive sentences comports with <u>Yarbough</u> and is supported by the judge's findings that the crimes have different objectives, and were committed at separate times and locations. Indeed, the <u>Yarbough</u> factors "should be applied qualitatively, not quantitatively" and "a sentencing court may impose consecutive sentences even though a majority of the <u>Yarbough</u> factors support concurrent sentences." <u>State v. Carey</u>, 168 N.J. 413, 427-28 (2001).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1022-19